232 S.W.2d 188 (1950)
RAMOS
v.
RAMOS.
No. 27888.
St. Louis Court of Appeals. Missouri.
July 18, 1950.
*189 A. G. Jannopoulo, St. Louis, for appellant.
Joseph N. Hassett, Ernest E. Baker, and Thos. J. Boland, all of St. Louis, for respondent.
McCULLEN, Judge.
This is an action for divorce. It was brought by appellant as plaintiff on July 2, 1948. The trial was begun on March 24, 1949, and concluded on April 28, 1949. On July 25, 1949, the court entered a judgment against plaintiff denying and dismissing his petition and entered judgment for defendant on her cross-bill, granting her an absolute divorce and custody of the minor child. The court also ordered that plaintiff have the privilege of visiting with said minor child every Thursday from 2 P.M. to 3 P.M. at the home of the defendant until further order of the court, and that the costs of the proceedings be paid by plaintiff. Thereafter plaintiff filed a motion for a new trial which was overruled and plaintiff duly appealed.
*190 Plaintiff alleged in his amended petition that he and the defendant were married on August 4, 1947, and separated June 23, 1948; that he faithfully demeaned himself and at all times discharged his duties as the husband of defendant and treated her with kindness and affection; that defendant disregarded her duties as his wife and offered him such indignities as to render his condition in life as her husband intolerable. Plaintiff set forth in his petition twelve different charges of indignities against defendant.
Plaintiff further alleged that a child was born of the marriage, namely, Michael, a boy 3 years old; that plaintiff is a resident of the City of St. Louis, Missouri, and has resided in said city for more than one whole year next before the filing of the petition. He prayed for an absolute divorce and custody of the child.
Defendant's amended answer admitted the marriage, the birth of the child and the separation as alleged in plaintiff's amended petition, but specifically denied all of the indignities alleged by plaintiff. Defendant filed an amended cross-bill in which she alleged that at all times since the marriage she faithfully demeaned herself and discharged her duties as the wife of plaintiff and at all times treated him with kindness and affection, but that plaintiff offered her such indignities as to render her condition in life as his wife intolerable. Defendant alleged specifically a number of such indignities.
On August 8, 1948, plaintiff filed a motion in which he referred to the allegations of his petition charging that defendant was not mentally capable of properly caring for, educating or instructing their infant child. In said motion plaintiff stated a number of incidents of conduct on the part of defendant which plaintiff alleged showed defendant's mental deficiency and requested that a mental examination of defendant be made in order that the court be fully and properly informed regarding the custody of the minor child and charging that the future welfare and well-being of the child is in jeopardy while in the custody and control of defendant because of her mental condition. No specific action was taken by the court on the above motion.
Plaintiff also filed a motion asking for custody of the minor child pendente lite in which he alleged misconduct on the part of defendant in relation to the care of the child, charging that the well-being of the child is in jeopardy while in the custody and control of defendant because of her mental condition. On January 31, 1949, the parties filed a stipulation agreeing that all motions theretofore filed by plaintiff be presented at the time of the trial of the cause and that all evidence in connection with said motions be offered and heard simultaneously at the trial of the divorce action.
It appears from the testimony that plaintiff and defendant were married at Warrenton, Missouri, on August 4, 1947. Plaintiff was then 42 years of age and defendant 28 years of age. Plaintiff had been married before and divorced. He had two children, a boy 17 years of age and a girl 14 years. Defendant's marriage to plaintiff was her first marriage. Plaintiff is a native of Puerto Rico and a graduate of Yale University Medical School. He practices his profession as a medical doctor and surgeon in St. Louis, Missouri, and has had experience in the treatment of mental cases. It appears that plaintiff and defendant both lived at the Saum Hotel in St. Louis before they went together and kept company for about one year before their marriage. After the marriage plaintiff moved into defendant's apartment at said hotel, and that they lived there from August 4, to September 2, 1947, when plaintiff went to Mount St. Rose Sanatorium for an operation for tuberculosis. He had asked defendant prior to the marriage to postpone the marriage until after the operation. She refused to postpone the marriage and told him she would go through with it just the same. On September 2, 1947, plaintiff entered the sanatorium, underwent the operation, and remained there until November 30, 1947.
Plaintiff testified that defendant did not visit him regularly when he was in the hospital; that soon after the operation, or about a little more than a month after the *191 marriage, on one of her visits to the hospital, she brought him a loaded 45 caliber pistol and a bottle of whiskey without giving him any explanation of her act in doing so; that during the time that he lived with defendant he treated her with kindness and courtesy, but she treated him coldly and indifferently; that on an average he returned to his home about 10 P.M. each evening because he had office hours that lasted until about 9:30 P.M.; that he took defendant to places of amusement almost every evening during August 1947, and also from December 1 to 17, after he returned from the hospital although he was still ill; that he took plaintiff on a trip to Puerto Rico and upon his return she refused to go out with him; that on several occasions he invited defendant to go out to dinner with him, but she always refused; that he was not introduced to any of her friends and does not know any of them; that defendant told him she did not love him; that she hated him and was going to get a divorce; that she refused to cook his meals or do the housework and that he had to eat his meals in a restaurant because they never were prepared for him at home; that defendant maintained a dirty and untidy home; that they had roaches and bugs until he used D.D.T. poison which helped the condition. Plaintiff further testified that defendant's Aunt Adda Ohmeyer interfered in their affairs and was one of the causes of the separation and divorce; that Aunt Adda sent defendant to an obstetrician without consulting plaintiff and told defendant that if plaintiff was any kind of a man he would have returned home in time for the birth of the child. Plaintiff stated that at the time of the birth of their child he was ill in Puerto Rico, although he was up and around for a few hours each day; that Aunt Adda told defendant that if plaintiff did not sign an antenuptial agreement (which plaintiff did sign) he was marrying defendant for her money and did not love her; that Aunt Adda made herself a trustee under the antenuptial trust agreement of defendant's fortune; that the trust was created before the antenuptial agreement was executed; that Aunt Adda further advised defendant to divorce plaintiff and had so advised her before there had been any quarrel between plaintiff and defendant; that defendant told plaintiff on one occasion that her Aunt Adda said that if defendant made a nuisance of herself by not cooking and not taking care of plaintiff's clothes and by not answering his phone for professional calls and appointments, plaintiff, being a sick man, would leave her and her child and would thereby give defendant grounds for divorce; that defendant left their home for long periods of time during the day and night and would return home about 11 P.M. without explaining where she had been although plaintiff would inquire; that every Friday night defendant would regularly be away from home and plaintiff did not know where she was; that during the latter part of June 1948, immediately prior to the separation, defendant locked plaintiff out of their home and changed the locks on the door and refused to allow him to enter; that on many occasions defendant asked him to leave her; that defendant never did any housework or work in their home. Plaintiff stated that he never did strike defendant and never did twist her arm, but that she called him a "quack" and slapped him on two different occasions and threw a pan of water striking him on the forehead; that at that time he threw water on defendant first, and after she threw the pan of water on him she left home and stayed away all night but did not take the baby with her. Plaintiff stated that he threw the glass of water on defendant because she was hysterical and in a tantrum about 12:30 at night; that she told him very loudly to get himself a girl friend and she would get herself a boyfriend. Plaintiff stated that throwing water on a person having a tantrum is recognized by the medical profession as a means of bringing the person out of such a condition. Plaintiff admitted that he found fault with defendant for neglecting their baby and for not cleaning the baby's bottles and stated that the baby became ill as a result of the defendant's neglect. Plaintiff stated that he wanted the child baptized in some Christian faith but defendant objected and *192 stated she did not want the child baptized until it grew up and became old enough to pick its own religion.
Plaintiff further testified that defendant is not mentally capable of properly caring for or raising their minor child; that she did not change the baby's diapers when they were wet or soiled, or even when the baby cried to be changed; that she did not feed the baby according to the instructions of its doctor; that at times the baby missed its feeding; that according to the instructions of the doctor the child was to be outdoors two hours daily, but that it was taken out by defendant, over plaintiff's objections, very often at night until 11:30 P.M.; that this happened sometimes when it was raining or damp and cold, when the child was about five weeks old; that defendant fed the baby from unclean bottles and the child became ill of diarrhea; that she allowed the child to cry for many hours at a time without any attention and the child developed an umbilical herenia; that on June 25, 1948, during the night, the child was very ill and plaintiff was up all night with it while defendant slept soundly; that she knew the child was sick, having been so informed by plaintiff when she returned home at 11 o'clock at night, but that she did not seem to understand what plaintiff was talking about; that on other occasions she did not seem to understand serious matters; that she was pregnant three months before she knew it; that when the baby cried or was wet defendant would lie on the couch working crossword puzzles; that even though plaintiff has an arrested case of tuberculosis, he requested, but defendant refused, to allow the baby to be innoculated or vaccinated for the prevention of this disease, although defendant's mother died of tuberculosis; that after the separation defendant refused to allow plaintiff to see the child for five or six months until an order of court was granted giving plaintiff that right.
Plaintiff introduced in evidence the record of defendant's I. Q. examinations in the St. Louis Public Schools during the period January 26, 1925, to September 1934, showing the results of three different I. Q. tests made wherein she received a grade of 72 on the Binet test and the grade of 78 on the Stanford-Binet test and a grade of 75 on the Multi-test, which results, he testified, showed that defendant was mentally abnormal. Plaintiff testified that children and adults are graded in the same manner and that a normal child six years old or a normal adult 40 years of age should receive a grade of 110-120; that defendant is a borderline case of intelligence and is near the mentally deficient classification; that a person receiving a grade of 72 in the Binet I. Q. test is a moron; that one receiving a grade of 78 in the Standord-Binet test is a borderline moron; that according to Taber's Cyclopedic Medical Dictionary (plaintiff's Exhibit No. 4) a moron has an I. Q. of 50 to 70 and a borderline moron an I. Q. from 70 to 80 with a mental age of a person between 12 and 13 years.
Dr. Thomas A. Wayland testified on behalf of plaintiff that he met defendant when plaintiff took her and their baby to his home for a visit; that while there defendant did not take care of the baby and when it needed changing plaintiff did the changing while defendant sat on the divan; that the witness examined the child and found it suffering from an umbilical hernia; that if there were a weakness present in a child of this age, excessive crying and nonattention could aggravate this condition to the point of repture; that the witness was thereafter told that the baby had quieted down and was all right; that plaintiff's reputation for morality, veracity and chastity is excellent.
Emmett Miller testified on behalf of plaintiff that he was a patient at Mount St. Rose Hospital during September 1947, and was in the same room where plaintiff was a patient; that he heard defendant make the statement while she was in the hospital room visiting plaintiff that she should have married a rich man as she would have been better off; that he saw defendant bring a paper bag to plaintiff at that time and saw a bottle of whiskey in the bag; that he could see there was another object in the bag but could not determine what it was.
*193 John Zimmerman testified as a witness for plaintiff that plaintiff and defendant with their child visited him and his family in the spring of 1948; that during the entire afternoon of this visit, plaintiff changed the baby and defendant did nothing but sit on the divan.
LeRoy Liebman testified as a witness for plaintiff that quite often during July 1948 he observed defendant leaving her apartment at night with the baby; that she returned many times with the child about 11:30 or 11:45 P.M.; that this occurred at times when it was raining or quite cold; that she left home at night on the average of four or five times a week; that at the request of plaintiff he watched to see when the baby would be taken out and brought back; that he is a personal friend of plaintiff and in doing the watching mentioned he was paying back a debt to plaintiff.
Dr. Robert Mueller, President of the Medical Association of Missouri, testified that plaintiff's reputation as to honesty, morality and truthfulness is very good.
Dr. Raymond E. Doyle testified as a witness for plaintiff that he is a physician and specializes in neuropsychiatry; that he is now Senior Instructor in Neuropsychiatry at St. Louis University School of Medicine and had also been Senior Physician and Assistant Superintendent at various State Hospitals in Missouri and Senior Psychiatrist in the Veterans' Hospital, Jefferson Barracks, Missouri, from 1925 to 1946; that an individual's I. Q. of 70-75 at the age of 13 or 14 would remain the same to the ages of 29 or 30 and later years; that the I. Q. tests defendant had taken with grades of 72, 78 and 75, respectively (as shown by plaintiff's Exhibit No. 2), indicates a degree of mental deficiency; that plaintiff's exhibit No. 4 indicates a moron has an I. Q. from 50 to 74 with a mental age of 10 to 11 years, a borderline moron has a I. Q. of 70 to 80 with a mental age of 12 to 17 years; that a moron or borderline moron would not be a proper person to raise or rear a child. The witness stated that during May 1948 plaintiff consulted him concerning defendant's mental condition.
Dr. Robert E. Britt testified as a witness for plaintiff that he is a specialist in nuerology and psychiatry and is Assistant Professor of Clinical Nuerology and Psychiatry at St. Louis University; that plaintiff's Exhibit No. 2 reflecting defendant's I. Q. test grades of 72, 78 and 75 in the St. Louis Public Schools is indicative that she was a person of borderline, feebleminded intelligence; that nothing can be done to bring up the I. Q. of such a person; that the prevailing tendency is that the I. Q. remains constant but as the individual grows older the I. Q., if anything, would have a tendency to drop; that the witness agreed with plaintiff's Exhibit No. 4 (Taber's Cyclopedic Medical Dictionary Chart) which states that a rating or grade from 70 to 80 of an individual indicates a borderline moron.
The witness gave further testimony with relation to I. Q. tests generally and stated that it is possible that such tests may be given to children in school when they do not correctly reflect the ability of the child.
Defendant testifying in her own behalf stated that after the marriage she and plaintiff moved into her apartment and lived there from August 4 to September 2, 1947, when plaintiff went to the Mount St. Rose Sanatorium; that he returned from the sanatorium about December 1; that they lived at the Saum Hotel until December 19, 1947, when they left to make a trip to Puerto Rico to visit his family; that defendant was going to have a baby and they intended to return to St. Louis before the baby was born; that she returned to St. Louis from Puerto Rico alone, arriving in St. Louis February 10, 1948; that plaintiff remained in Puerto Rico, although defendant wanted plaintiff to be with her when the baby was born; that the baby was born April 12, 1948, and plaintiff arrived in St. Louis shortly thereafter; that defendant remained in the hospital about ten days after the baby was born; that she had a practical nurse, Erna B. Goetz to aid her in caring for the baby when she came home from the hospital; that the practical nurse remained with her about ten days; that defendant did not get along very well in her health after the baby was born; that she *194 had several hemorrhages; that she regained her strength very slowly; that she was confined to her bed several days after each hemorrhage; that the separation took place June 27, 1948; that she treated plaintiff with kindness and respect and did what she could do to help him during the time they lived together; that late one night, on June 26, 1948, plaintiff struck defendant, dragged her around the room and threw water on her and on the couch in the living room where she had gone to sleep because he kept her awake reading and smoking in bed when they were in bed together in the bedroom; that as a result of this quarrel defendant ran out of the apartment and went to the home of her aunt where she stayed until the next morning because she was afraid of plaintiff and what he might do to her; that plaintiff struck her on two other occasions; that he twisted her arm in a fit of anger; that he was never affectionate or considerate; that he was cold and indifferent toward her; that he nagged her about the baby, about the baby's bottles, and the sterilizer all the time; that plaintiff was very abusive when she tied the baby's sleeves so the baby couldn't scratch himself or put his thumb, which was very sore, in his mouth; that plaintiff complained because she did not pick the baby up each time the baby would cry; that plaintiff told her she was stupid and had an I. Q. of a five year old child; that he ridiculed her; that plaintiff had a very bad temper, was grouchy and moody toward her; that he told her he could put her in an insane asylum and made remarks and tried to upset her; that plaintiff would not eat in the dining room at the hotel where they lived; that she tried her best to cook for him but he didn't like her cooking; that he would not eat the food sent to their apartment from the dining room.
Defendant further testified that she had no objections to the baby being baptized but because she was baptized a Catholic and not brought up a Catholic and her husband was a Catholic and never went to church, she thought it would be better to let the child become older and choose the church he wanted to belong to.
Defendant testified that on one occasion, prior to the incident of June 27, 1948, when she ran out of the house at night and went to her aunt's home, she was about to give the baby a bath and while she had it in her arms, plaintiff came over and struck her in the face many times; that he was angry on this occasion because she had not picked the baby up when it was lying on its bed, because she said that spoiled the baby; that at the time he struck her in the face with his hand and dragged her around the room he had been drinking whiskey; that she did not take the baby with her at the time she ran out of her home because she was afraid to. Defendant was asked by her counsel if any argument or dispute had taken place before plaintiff struck her and she answered, "I couldn't think of any." She was asked if plaintiff had given any explanation why he had struck her and she answered, "No, he didn't."
Dr. William B. Lytton testified for defendant that he is a psychiatrist and that he examined defendant several months prior to the trial; that he went to defendant's apartment in the Saum Hotel to see how the apartment was kept and found that it was very neat, clean and in good taste; that the baby was healthy looking; that defendant seemed to have a natural and normal interest in the child; that the baby showed good response to defendant; that he found defendant to be "quiet, a little shy, a rather gentle person, no evidence of any mental disturbance"; that defendant had apparently raised the child up to the time the witness saw it "perfectly all right"; that an I. Q. examination of defendant had been made by one Libby G. Bass and the report of that examination showed a grade of 85 for defendant; that he himself did not give an I. Q. examination; that an I. Q. test means the measure of intellectual capacity and has nothing to do with the individual's mentality. On cross-examination he stated he could not tell whether defendant or the hotel maid had cleaned the apartment; that his visit at that time lasted about two hours.
Dr. Oliver Anderhalter testified on behalf of defendant that he was Director of *195 the Institute of Research at St. Louis University; that he could not pass judgment either way as to whether defendant could properly raise a child in view of the grades received by her as the result of the I. Q. tests given her when she was a school girl, as shown by plaintiff's Exhibit No. 2; that the purpose of an I. Q. test is to indicate the mental capacity of an individual to do mental work and to perform intellectual things; that grades ranging from 70 to 80 in I. Q. tests come within a classification of borderline moron; that he could not answer the question of whether he would leave his own children in care of a baby sitter who had an I. Q. of 70; that he knows how to make I. Q. tests and has made them of individuals but has never ascertained the I. Q. of a person by looking at the person and that it is impossible to conduct an examination in that manner.
Dr. Anderhalter gave a comprehensive review of the origin, development and purpose of I. Q. tests, saying that the exact purpose is difficult to define; that the I. Q. test of the present day is primarily to indicate the capacity for intellectual work on the part of an individual; that such a test does not disclose characteristics as to moral character or social possibilities or social adaptability; that it does not show how much affection a person might have for his or her offspring nor the patience that such person might have towards his or her children; that an I. Q. test would not indicate whether a person would be a good mother or good father except to the extent that if the "test were so low that the lack or complete lack of knowledge were present, then it might indicate indirectly. However, with a minimum of knowledge present, it does not indicate at all."
The witness was asked if the Binet test given prior to 1930 is now considered an accurate measure of I. Q. and answered that the text book accompanying the Stanford-Binet test indicates that a revision was made in 1937 due to the fact that many of the tests that were included in the original Binet tests were found to be invalid because they were based upon too few cases to be reliable. It would serve no useful purpose for us to set forth here the closely analytical discussion of I. Q. tests which Dr. Anderhalter gave. It is sufficient to say that his testimony tended to show that the I. Q. tests made of defendant when she was a school girl many years before the trial, which were shown to the witness by plaintiff's Exhibits, were practically of no value in determining her mental and intellectual condition at the time of the trial because there "was insufficient evidence to make any judgment either way."
Dr. John C. Morfit, a medical doctor, testified on behalf of defendant that he had been at a social function where defendant was present and had observed her and the baby; that from his casual observation of the handling of the baby, the child appeared to be a normal, healthy child without any obvious defect; that defendant appeared to take care of the baby as an excellent mother. As to whether the child was clean or not clean, and well kept, the witness testified that the child was in first rate condition. The witness stated on cross-examination that he is the physician for defendant's aunt.
Erna B. Goetz testified as a witness for defendant; that she is a practical nurse; that she stayed at the home of defendant for ten days; that plaintiff did not show any concern over the hemorrhaging of defendant, but did bring Vitamin K and she injected it into defendant to stop the hemorrhaging a couple of days after plaintiff was told about her condition; that the witness and defendant had their meals together at different times than plaintiff ate; that the witness quit this employment suddenly because both plaintiff and defendant were not quiet when they were in the kitchen taking of refreshments that plaintiff had brought home; that this happened after the baby had been crying for a long period of time and had just fallen asleep and the witness became disgusted and quit; that plaintiff was not affectionate toward defendant but was cold and indifferent.
Ruby Gresham, Manager of the Saum Hotel, testified for defendant that plaintiff's reputation around the hotel was not very high. On cross-examination she testified that she disliked plaintiff very much and *196 would like to see defendant win this case. This witness denied that the Housing Expediter got after her because she raised plaintiff's rent.
Loretta Litzinger, a beauty operator in the Saum Hotel, testified for defendant concerning an incident in June 1948, when she saw plaintiff in a drugstore near the hotel intoxicated; that plaintiff was practically falling all over himself at that time; that when she saw him plaintiff was flopping around in the drugstore from stool to stool.
Margaret Webb, a hostess at the Saum Hotel, who assists in the arranging of parties there testified on behalf of defendant that she knows defendant and regards her as a lovely girl; that defendant is an exceptional mother and whenever she saw the baby the baby was clean.
Elizabeth Lewis, a married woman living in Richmond Heights, who has three children of her own, testified on behalf of defendant that she knew defendant all of her life and had seen her quite often since defendant was married and had been in her home since the marriage; that defendant had brought her baby out to the home of the witness many times and the baby always looked "lovely," and that defendant always gave the baby proper attention as a mother; that defendant's reputation was of the highest; that she never saw plaintiff and defendant together; that defendant's home was clean and tidy; that defendant never brought plaintiff out to the witness' home and never introduced him to her.
Nana Pietrowski, a witness for defendant, testified that she knew defendant for seven years; that her reputation was very good; that she had been in defendant's home since her marriage on numerous occasions and found her home neat and orderly and the baby was always clean; that she did not know plaintiff and had never seen plaintiff and defendant together. In answer to the question, "Have you any idea why, why she didn't bring her husband around to meet you?" the witness answered, "Possibly she wasn't too proud of him."
Plaintiff contends that the evidence established that he is the innocent and injured party in this proceeding and that defendant did not make a prima facie case for divorce against him. Defendant contends to the contrary that she is the innocent and injured party and that the evidence shows that she is entitled to a divorce from plaintiff. It will thus be seen that the contentions of the parties in this court are in irreconcilable conflict just as was their evidence in the trial court.
This case having been tried without a jury, it is the duty of this court to review the entire record as in a suit of an equitable nature. Laws Mo. 1943, Section 114(d), page 388, Mo.R.S.A. § 847.114(d). This means that we must reach our own independent conclusions on the whole evidence and are not bound by the judgment of the trial court. Nevertheless, it is also our duty in a case such as this, where the issues are highly controversial and the evidence of each party is in direct and irreconcilable conflict with that of the other party, to make proper allowance for the advantage the trial judge had in seeing and hearing the parties and witnesses as they gave their testimony. This, of course, placed the trial judge in a far better position to determine the credibility of the witnesses and the weight to be given to their testimony than any appellate court could, with only the cold record before it. The appellate court should, therefore, defer largely to the trial court on such questions. Shea v. Shea, Mo.App., 94 S.W.2d 1102; Pickett v. Pickett, Mo.App., 150 S.W.2d 587; Zamzow v. Zamzow, Mo.App., 159 S.W.2d 346; Ridge v. Ridge, Mo.App., 165 S.W.2d 294; Greenbury v. Greenbury, Mo.App., 223 S.W.2d 153.
Plaintiff contends that all of defendant's evidence against him was without corboration and that a divorce should not have been granted to defendant under such circumstances. The case of Magruder v. Magruder, Mo.App., 31 S.W.2d 213, is cited by plaintiff in support of his contention. The Magruder case was so different from the case at bar on its facts that we find nothing therein that would justify interference *197 on our part with the action of the trial court in the case at bar. In the Magruder case the trial court itself found against plaintiff therein and dismissed his petition for divorce. On appeal this court merely refused to interfere with the trial court's action and said, 31 S.W.2d loc. cit. 214: "this is one of the cases in which an appellate court ought to defer largely to the judgment of the trial court. * * *" On the evidence in the case at bar we believe it is our duty to reach the same conclusion reached by the trial judge, namely, that plaintiff is not the innocent and injured party, but that defendant is the innocent and injured party and entitled to a divorce from plaintiff.
The Magruder case, supra, does not hold that a divorce should never be granted on the uncorroborated testimony of the prevailing party. On the contrary, the law is established that corroboration of the prevailing party's testimony in a divorce suit is not necessarily a prerequisite to a decision in such party's favor. Ridge v. Ridge, Mo.App., 165 S.W.2d 294; Stevens v. Stevens, Mo.App., 158 S.W.2d 238.
We are satisfied, however, that in the case at bar there was much corroboration to support defendant's charges of indignities against plaintiff. Plaintiff's own testimony shows that he assumed an attitude of mental and intellectual superiority over defendant that would be impossible for any normal, self-respecting woman to endure without a feeling of deep personal insult.
It will be recalled that plaintiff filed a motion to have defendant examined on the ground that she was mentally deficient and incapable of properly rearing their child, and he also filed a motion asking that custody of the child pendente lite be taken away from defendant on the same grounds. Furthermore, at the trial plaintiff introduced the testimony of doctors who gave no testimony of their own with respect to any examinations made by them of defendant but based such testimony as they did give upon what was shown in certain I. Q. examinations made of defendant by other persons many years before the trial when defendant was a young school girl. We believe that all of such evidence adduced by plaintiff, including his own personal testimony, corroborated defendant's evidence to the effect that plaintiff committed against her intolerable indignities which justified a divorce being granted to defendant. We can conceive of no more humiliating charge that could be made against a normal wife than the charge made by plaintiff that defendant is of such a low order of intelligence and intellect as to be incapable of performing the duties as wife and mentally unfit to care for her child. Plaintiff went so far as to attempt to show by his exhibits explained by the testimony of his doctor witnesses, that defendant was either a moron or at least a borderline moron. Charges of such a nature should never be made by one spouse against the other, especially where a child is involved, unless there is clear and convincing proof to sustain them. As we view this record plaintiff's evidence failed to sustain such charges against defendant.
We have heretofore set forth the testimony of all the witnesses rather fully and it is not necessary to repeat it here. It is sufficient for us to say that we are of the opinion that the greater weight of the evidence shows that defendant was and is fully capable of performing her duties of caring for her home and her child, and that she did so under very trying circumstances during the time she was married to plaintiff.
Plaintiff argues that the trial court committed error in permitting Dr. William B. Lytton to testify from defendant's Exhibit A, which was a written report of an I. Q. examination of defendant made by one Libby G. Bass. Plaintiff contends that this was improper because Dr. Lytton was not present when such I. Q. examination of defendant was made; that although Dr. Lytton stated he never made an I. Q. examination of defendant, he was nevertheless permitted to testify that defendant's I. Q. was 85 as shown by said Exhibit A. It must be remembered that this was not a trial before a jury in which incompetent evidence might be said to have improperly influenced the result. The case *198 was tried before the court only, and we cannot assume that the court was influenced by incompetent evidence. There was ample competent evidence to support the conclusion reached, and the trial judge could exclude from his consideration any improperly admitted evidence. Pickrel v. Pickrel, Mo.App., 86 S.W.2d 336. The trial judge permitted plaintiff to introduce, over defendant's objections, much evidence of a hearsay nature in relation to the I. Q. examinations made of defendant when she was a school girl and having done that, we think he properly permitted defendant to introduce evidence to combat plaintiff's evidence on that phase of the case. Massman v. Muehlbach, 231 Mo.App. 72, 80, 95 S.W.2d 808, 814. We find no reversible error in the action of the trial court in this respect.
Plaintiff contends that the court erred in failing to dispose of his motion for a mental examination of defendant. It is true that the court did not specifically rule on either of plaintiff's two motions but we believe plaintiff is in no position to complain on this point. The motion for a mental examination was never brought up by plaintiff for action by the court at any time before the trial was begun. On the contrary, the record shows that both parties by written stipulation agreed with the court that the court should hear evidence on plaintiff's motions along with the evidence on the issues at the trial of the cause. No doubt, it was because of the stipulation of the parties in relation to these motions that the court allowed the parties the wide latitude it did allow them in producing their evidence. The court conducted the proceedings in relation to the cause as well as on plaintiff's motions at one and the same time in accordance with the stipulation of the parties. The court having found against plaintiff on his petition and in favor of defendant on her cross-bill, a result wholly and completely inconsistent with mental unfitness or incompetency of defendant, as charged by plaintiff, thereby necessarily ruled adversely on plaintiff's motion for a mental examination of defendant as well as his motion for change of custody of the child pendente lite. Inasmuch as plaintiff invited the court by his stipulation to dispose of his motions in this manner he is not in a position to charge the court with error in this respect. We hold that the court committed no error in failing to make specific findings on plaintiff's motions. Hoffman v. Hiram Lloyd Building & Construction Co., 204 Mo.App. 539, 223 S.W. 813.
Plaintiff's final contention is that the court erred in denying him the right of reasonable access to his child by ordering that he have the privilege of visiting with the child only every Thursday from 2 P.M. to 3 P.M. at the home of defendant until the further order of the court. The evidence shows that the child at the time of the trial was of a very tender age, being less than two years old. The court made no order requiring defendant to make any contribution to the child's support in the future, nor is there any question of alimony involved in the case. It appears that defendant has ample means of her own to support herself and the child in comfort. The sole question, therefore, to be determined on this point is what disposition will serve the best interest and welfare of the child under the unfortunate circumstances shown by this record. Section 1528, R.S.Mo.1939, Mo.R.S.A.§ 1528.
The trial court has continuing jurisdiction over this child and authority to make such orders as may be necessary from time to time until the child reaches its majority. Section 1525, R.S.Mo.1939, Mo.R.S.A. § 1525; Thornton v. Thornton, 221 Mo.App. 1199, 2 S.W.2d 821; Mayes v. Mayes, 342 Mo. 401, 116 S.W.2d 1. The court herein not only had before it the parties, but also heard much testimony of their respective witnesses (the transcript contains 453 pages of typewritten matter) and was, therefore, in the best possible position to decide what kind of an order would be for the best interests of the child, not only with respect to its custody but also as to the rights of visitation on the part of the father.
The matter of determining these questions has been vested by the law *199 in the discretion of the trial court and an appellate court should never interfere with the exercise of such discretion unless the record shows clearly that it has been abused. We find no evidence of abuse of discretion in this case.
When the child is somewhat older and is not so much in need of the care of a mother as it is during these tender years, plaintiff may avail himself of the privilege allowed by the law to file a motion in the trial court requesting that his right of visitation be enlarged and that question can be determined by the trial court in the light of the evidence then presented. Other questions raised by plaintiff are necessarily disposed of by what we have said herein.
The judgment of the trial court is affirmed.
ANDERSON, P. J., and HUGHES, J., concur.