**Ethel LONG, Plaintiff-Respondent,**

v.

**Herbert LONG, Defendant-Appellant.**

**No. 7347.**

Springfield Court of Appeals. Missouri.

June 10, 1955.

Roy Coyne, Joplin, Robert Stemmons, Jr., Mount Vernon, for defendant-appellant.

Charles E. Ginn, Aurora, for plaintiff-respondent.

RUARK, Judge.

On September 11, 1953, respondent, then plaintiff, Ethel Long, filed petition for divorce against Herbert Long, the defendant-appellant, charging general indignities and praying for the care and custody of their two infant children. Defendant countered with answer and crosspetition wherein he charged plaintiff with improperly associating and corresponding with and accepting gifts from other men, with neglect of her children, with having left the defendant on at least ten occasions, and with ungovernable temper. He also prayed for care and custody. On trial of the case the court granted divorce to the defendant on his crosspetition but awarded care and custody to the plaintiff with the sum of $50 per month for maintenance of such infants. Plaintiff has not appealed and the only question before us is the correctness of the court's determination in respect to custody. It is appellant's contention that the trial court failed to give proper consideration to evidence which, in his view, showed plaintiff to be unfit for such custody.

The parties were married on June 15, 1950. Defendant testified he was twenty-four years of age at date of trial (February 27, 1954). Plaintiff's age is not shown, but it is evident she also was young; and it

appears this sorry affair has resulted because the two of them were not sufficiently mature to assume the obligations and burdens of married life rather than because of any viciousness inherent in either of them. Immediately after the marriage they went to live with defendant's parents on such parents' farm near Sarcoxie, Missouri. Plaintiff testified that prior to the marriage it was agreed that the residence with defendant's parents was to be for two weeks only but that it continued for a considerable portion of their married life. At some later time, date not shown, plaintiff and defendant moved to themselves on a rented farm. During the year 1951 defendant bought and sold (nine) automobiles and he said they lived off the profits from these ventures. For some period, date also not clear but probably in the years 1951 and 1952, defendant farmed in partnership with his father. Early in 1953 he went to work at the Vickers plant in Joplin, Missouri, where he received $400 per month. He continued at this work until October 1953. He was drafted into the Army in December 1953. A son, Robert Lee, was born in May 1952 and another son, Michael, was born September 4, 1953. It is these children who are the subject of the controversy.

The marriage between the parties was fraught with frequent separations. There had been two divorce suits filed previous to the instant case. One was brought by plaintiff in January 1952. One other had been brought prior to that time, but the record is silent as to who instituted it. Both of these cases were dismissed.

One of the charges made by plaintiff against defendant was that he squandered his money and failed and refused to support his family. During a considerable portion of their married life a credit arrangement existed at a store where defendant's necessities and those of his father were charged to the same account. There was considerable evidence that the defendant on more than one occasion wrote hot or insufficient funds checks which "bounced." On some occasions defendant's father furnished the funds to make good these checks.

Plaintiff testified that defendant worked only off and on and was fired from one place when he went to sleep on the job, that she couldn't get him up to go to work, that he would sleep until noon and then be gone and that he never took her anyplace with him. She also testified that defendant never bought her any clothing except on one occasion when she was separated from him and he was attempting to get her to return, that most of her clothing was furnished by her parents, and that he bought socks for himself which cost $5 a pair. While defendant was working at the Vickers plant he was arrested for nonsupport. In a conference with the prosecuting attorney he agreed to pay the plaintiff $50 per month and to pay certain doctor and hospital expense attendant upon the birth of his children. He gave the prosecuting attorney a check for $180 and thereafter stopped payment on such check. He testified he later paid the doctor direct. The record is somewhat confused on the subject, but it would appear that the hospital bill for the birth of one of his children was still unpaid at the time of trial.

In the week immediately preceding the birth of his second child the defendant went to where plaintiff was staying with her mother (the parties were again separated at that time) and, according to plaintiff's testimony, he there assaulted both plaintiff and her mother in an attempt to take the older child, Robert Lee, away by force. This affair graduated to the police court. Defendant denied having assaulted either plaintiff or her mother but admitted he was attempting to take the child. Plaintiff testified he took the child away from the house by force, but whether by force or otherwise he did secure the infant against the consent of the plaintiff and took the child to the home of his parents near Sarcoxie, where such child has since remained.

Defendant's evidence in the main was directed to alleged neglect of the children on the part of the plaintiff and alleged incidents of misconduct and improper correspondence, or correspondence indicating improprieties, with other men. As to neg-

lect of the children, defendant testified that plaintiff kept a filthy house, that she would accumulate stacks of dirty dishes and dirty diapers and that she fed the (older) baby cold milk. His testimony in this regard was largely unsupported. He called as a witness a Mr. Tinsley, who had purchased the farm where the parties lived and who was in the house in March of 1953. This witness testified the house was dirty and in bad shape, but it appears that the parties were separated at such time and any accumulation of filth could have been defendant's own doing. Plaintiff testified that the only time dirty dishes or diapers accumulated was when she did not have water to wash them. The evidence was that water was supplied by gasoline pump which had to be started by crank. Defendant's witness Tinsley, owner of the farm, testified the pump engine was such he did not think a woman of plaintiff's size could start it. Plaintiff also produced witnesses who testified that from their observation plaintiff kept the children clean and healthy.

One of defendant's charges was that plaintiff accepted gifts from other men. The evidence in this respect was that on the first Christmas after the marriage she received from a boy in the service, apparently a former suitor, a wrist watch. Plaintiff testified that defendant told her to keep it and he would tell everyone that he (defendant) gave it to her. Defendant denied making that statement but admitted knowing that she received the gift and that he was simply "easy going" about it.

Defendant sought to establish plaintiff's unfitness by three incidents. The first occurred in April 1951. This was before either of the children had been born and while the parties were separated. Plaintiff was working at a cafe and at its closing, sometime after nine o'clock, got into an automobile with three boys and rode off. The defendant sighted them and followed, and they in turn sighted defendant and ran off and left him. Defendant hid in the bushes near where plaintiff was staying at that time and later in the evening one of the boys brought her home.

The only conflict in their evidence concerning this incident is the time plaintiff got home. For another incident defendant called a witness Campbell, who testified that upon one occasion he saw plaintiff sitting in an automobile in front of a drive-in restaurant. There were two other girls with plaintiff in the front seat and three boys in the back seat. Plaintiff testified that the two girls were friends at whose house she had been visiting and the boys were her brother and two of his friends whom she was taking home from the show. For another incident defendant called a witness Staley, his relative by marriage, who lived in Kansas City and visited overnight at the home where plaintiff and defendant were then living. This witness testified that early the next morning when plaintiff arose she came from her and her husband's bedroom through the room where he, the witness, was sleeping, and while in the room where he was in bed said, "What would you do if I got in bed with you?" He testified he made no answer and plaintiff said nothing further but went on into the kitchen. At that time plaintiff's husband was in bed in the adjoining bedroom and the door was open. It was necessary to go through the bedroom which the witness Staley then occupied in order to reach the kitchen. Plaintiff denied having made such statement.

The foregoing covers in substance all of the alleged incidents of misconduct, with the exception of the correspondence; which is the gravamen of defendant's claim. Defendant produced Exhibit A, which was a Christmas tag evidently accompanying the wrist watch. On it was written, "To Ethel, with all the love in the world, Don." Defendant's Exhibit E was a letter addressed to plaintiff by her maiden name at Carthage, Missouri, dated Sunday May 20, but as to whether it was mailed in 1950 or 1951 we are not clear. It was evidently written by a man in the service and contains an account of the doings of sailors on Armed Forces Day. It concludes with a request for a picture and a P. S., "Write soon." There is nothing in the letter which indicates other than the writer held plaintiff

in highest respect. Defendant's Exhibit B is a letter written by plaintiff to a "Dearest Bob." The letter is undated, contains only a few commencing lines and is unfinished. It does not contain any indication of prior or planned misconduct. Plaintiff testified it was a letter she had started to write to an ex-boy-friend to tell him she was married but that she never finished it.

The only letter which we regard as of any considerable importance was one written by the plaintiff. It was dated December 24, 1952, and addressed to "My dearest darling Don." It stated, "I was in town today and tried to see you, but you were not to be found," and "I guess you let me make a fool of myself, or rather that is the way I take it." The letter contained some terms of endearment and the statement, "I guess I did the wrong thing the last to (sic) times I was with you. I should have known better, but I guess you got the best of me. Well, I guess there is no sense crying over spilled milk now, because it was my fault anyhow, but I am not sorry and I know I never will be." Plaintiff's explanation of this letter was that "I wrote it because I wanted to make him jealous, think he was losing me, so he would have more affection than he had the years we had been married." She said that she copied portions of the letter quoted out of a True Story magazine, that she left it in an open, unsealed envelope in her purse where, to use her words, "he would find it because he was looking for loose change that Mother and Daddy might have give me." He found it.

■ In a case of this character it is our duty to review the whole record and reach our own conclusion, but where the evidence is conflicting and a determination of the truth involves credibility of witnesses great deference is paid to the judgment of the trial court, who had the advantage of seeing and hearing the witnesses. His determination is not lightly to be disregarded and should not be set aside unless clearly erroneous. Cadenhead v. Cadenhead, Mo.App., 265 S.W.2d 426, 436; Ramos v. Ramos, Mo.App., 232 S.W.2d

188, 196; Taylor v. Taylor, Mo.App., 224 S.W.2d 412, 416. This rule is especially applicable where, as here, the order and sequence of events and some of the specific items or incidents under discussion between the attorney and witness are not entirely clear in the record.

■ Custody of the child or children is usually awarded to the person adjudged to be the innocent and injured party in a divorce case, but this is not always true and it has long been held that although the divorce may be awarded to one party circumstances affecting the welfare of the child may require the placing of care and custody in the other. Lusk v. Lusk, 28 Mo. 91; Zerega v. Zerega, Mo.App., 200 S.W. 700; Martin v. Martin, Mo.App., 238 S.W. 525; Bedal v. Bedal, Mo.App., 2 S.W.2d 180. The cases are innumerable in which part-time custody is awarded to the so-called guilty party in a divorce action. Where there is evidence to support a finding by the trial court that plaintiff was guilty of various indignities other than those which unfit her for custody, the court having awarded her the custody, we will assume his award of the divorce was on those grounds and because of those indignities which do not necessarily disqualify her from such custody. Burtrum v. Burtrum, Mo.App., 210 S.W.2d 364, 369.

■ In determining the question of custody the guiding star which the court must follow is the welfare and best interests of the child. Watkins v. Watkins, Mo.App., 230 S.W.2d 778; Frame v. Black, Mo.App., 259 S.W.2d 104, 107; Mayo v. Mayo, Mo.App., 244 S.W.2d 415, 416. And the custody will not be awarded simply to meet the wishes of either parent nor with any idea of punishment or vengeance. Perr v. Perr, Mo.App., 205 S.W.2d 909, 911; Harviel v. Harviel, Mo.App., 247 S.W.2d 346, 347; Lutker v. Lutker, Mo.App., 230 S.W.2d 177.

■ It has been declared many times that, all other things being equal, custody of the child or children of tender years should be awarded to the mother. Wells

v. Wells, Mo.App., 117 S.W.2d 700; Brake v. Brake, Mo.App., 244 S.W.2d 786; Tuter v. Tuter, Mo.App., 120 S.W.2d 203; Bell v. Catholic Charities of St. Louis, Mo.App., 170 S.W.2d 697; Lehr v. Lehr, Mo.App., 264 S.W.2d 35. With all his technological and social advances, man has found no substitute for the care and affection of a mother.

■ Plaintiff is living with her parents in a reasonably comfortable home. Defendant is in the Army. He testified that if he received custody of the children they would be kept at his parents' home while he was in service, and both his parents testified as to their willlingness to keep and care for the children. Defendant did not relate his plans beyond this arrangement except that he had applied for and expected to obtain a hardship discharge from the Army because of (a) the necessity for care of his children and (b) the physical disability of his father. However, his father testified that he, the father, was in good health and did all the work that was done around the farm. It appears, therefore, that the question here, as in the case of Abel v. Ingram, 223 Mo.App. 1087, 24 S.W.2d 1048, is in reality a conflict over whether the actual custody, care and training of the children will be lodged in the mother or the paternal grandparents. The reputation of the grandparents (on both sides) is not questioned in any respect. Defendant's parents have a comfortable modern home and no doubt they would do their very utmost to guide their grandchildren in the correct way of life. However, the courts have said many times that the first right (and responsibility) is in the natural parent, and in event of contest between the parent and the grandparents the courts will, unless prevented by circumstances inimical to the welfare of the children, disregard the wishes of the grandparents and award custody to the parent. The case of Wilson v. Wilson, Mo.App., 260 S.W.2d 770, contains a complete exposition of this subject.

■ The trial court, who saw and heard the witnesses and was in a better position to judge as to their credibility, could well have determined that plaintiff was the guilty party in so far as the termination of the marriage was concerned because of her frequent separations, her evident lack of affection for defendant, and perhaps because of her indiscretions, without determining that she was in any way unfit as a mother. As a matter of fact, with the exception of the controversial letter which she wrote, the imputations against her character are more conjectural than actual. As to such letter the court no doubt believed her explanation. As to the testimony of the witness Staley, the court could have believed the words were spoken in jest or he could well have disbelieved the witness in toto. On the other hand, there was evidence concerning defendant's irresponsibility and perhaps willingness to substitute suspicion for facts, which may not have recommended him as one qualified to receive the custody of two children of tender years. It is our opinion that the court acted well within his discretion. The award of custody is not conclusive of the future and if changed conditions should indicate that the best interests of the children will be served by its modification such can be done; but for the present we agree with the trial court that such infants belong with their mother, and if she is now deprived of the custody of either of them that situation should be remedied immediately and without any further delay.

We therefore affirm the judgment of the lower court and direct that such orders be made as will accord with the views herein expressed.

McDOWELL, P. J., and STONE, J., concur.