230 S.W.2d 778 (1950)
WATKINS
v.
WATKINS.
No. 21386.
Kansas City Court of Appeals. Missouri.
June 5, 1950.
Richard C. Jensen, Kansas City, Maurice Pope, St. Joseph, Walter A. Raymond, Kansas City, for appellant.
Landis & Landis, John C. Landis, III, Strop & Strop, St. Joseph, for respondent.
BROADDUS, Judge.
This case comes here on appeal from the trial court's ruling on motions to modify a judgment of divorce with reference to the provisions of the original decree touching the custody of the two minor children of the parties. The appellant was the plaintiff in the original divorce case and was the first person to file a motion to modify. However, the decree went to the defendant on his cross-bill in the original proceedings, and the decree was also in the defendant's favor on his cross-motion to modify the decree as to the custody.
The parties were married on January 2, 1941. They were divorced November 14, 1948. The divorce was awarded to the defendant, the husband, on his cross-bill, and *779 he was adjudged to be the innocent and injured party. The defendant's cross-bill in the divorce proceeding alleged, and the court's decree adjudicated, that the plaintiff wife remained away from home for long intervals of time without disclosing her whereabouts to the defendant; that she neglected to care for the children, failed and neglected to cook proper meals for them, or to dress and care for them properly; that she failed and neglected to take care of the home and failed frequently to cook meals for the defendant; that on numerous occasions she threatened to abandon the children and the defendant. It was also pleaded and adjudged that plaintiff associated with another man.
On the day the decree of divorce was entered, but prior to its rendition, the parties entered into a written stipulation relative to certain property rights and relative to the custody of their minor children, subject to the approval of the court. There are two minor children, Catherine Ann Watkins, who was aged six, at the time of the original decree and seven at the time of the modification, and Thomas Dodd Watkins, who was aged two at the time of the original decree and three at the time of the modification.
The stipulation provided that in the event of a divorce it was the desire of the parties that plaintiff would have the custody of one of the children "until and unless otherwise ordered by the Court," but that she should not remove the child from St. Joseph, Missouri. The defendant insisted on this provision because of plaintiff's neglect of the children.
The decree of divorce referred to this stipulation and followed it by awarding custody of Thomas Dodd Watkins to defendant and the custody of Catherine Watkins to the plaintiff "until and unless otherwise ordered by the court." The decree further provided that neither child should be removed from St. Joseph, Missouri.
On April 1, 1949, following the divorce the preceding November 15, plaintiff moved to Kansas City, Missouri. On April 8th she filed her motion to modify the decree. On the 22nd day of April she married M. J. Coen. On May 20, 1949, she filed the amended motion on which the case was tried. In both the original motion and the amended motion she alleged that it would be for the best interests of the children to live together under the custody and control of either the plaintiff or the defendant, and she prayed the judgment of the court for such an order as would be for the best interests of the children.
The defendant filed his amended answer to plaintiff's motion in which he denied that it would be for the best interests of either of the children to be in the custody of plaintiff and her then husband. The defendant also filed his amended cross-motion to modify the decree in which defendant asked the court to grant to him the custody of Catherine Ann Watkins, he already having custody, under the original decree, of Thomas Dodd Watkins. The decree of the trial court was against plaintiff on her motion and in favor of the defendant, on his cross-motion, and the custody of Catherine Ann Watkins was awarded to defendant so that he now has the custody of both children.
Plaintiff, at the time of the hearing in August, 1949, was 31 years of age, and in excellent health, except that she was then pregnant. She was not employed and stated that she could be home with the children all the time if given their custody. She has ample means of her own. The apartment in which she lives in Kansas City with the present husband, Coen, is located in a newly developed addition of modern homes located between 45th and 47th Street on the Paseo, known as "Village Green." Her apartment has two bed-rooms, one for plaintiff and her husband, and one for the children. It is a nice residential district, five blocks from a grade school and three from a high school. A policeman takes the children across the Paseo in going to and from the grade school. Village Green is a planned area with playgrounds for children as a part of the program.
Although he had never seen plaintiff's apartment defendant stated: "I assume it is probably a very nice home from the physical standpoint."
M. J. Coen is Irish, 32 years of age, was born in Iowa and spent most of his boyhood *780 in St. Joseph, Missouri, where he graduated from high school. While in high school he was captain of the basket ball team, vice-president of the student body and senior class in 1935. He also attended Junior College in St. Joseph and graduated from Oklahoma A. and M. at Stillwater, in January, 1940. He worked for Socony-Vacuum as assistant purchasing agent until he was drafted into the army in August, 1941. He was in the army for four and one-half years in various camps in this country and also served in the South Pacific. After leaving the army he went with his present employers who are investment brokers in Kansas City. He sells securities and has an annual income of between $10,000 and $11,000. He helped organize the Hi-Y in St. Joseph, belongs to the Central Presbyterian Church in Kansas City and is fairly regular in attendance. He became acquainted with plaintiff 15 or 20 years ago and had dates with her in 1937. November 11, 1942, he married Dorothy Yount. During the time he was married to Dorothy he carried in his wallet her picture and also the picture of plaintiff. Dorothy worked during the time she was married to Coen and bought her own clothes. She procured a divorce from him in Kansas City on February 10, 1949.
Plaintiff produced a number of witnesses who testified to the good reputation of plaintiff, her family and as to the good reputation of Coen.
Plaintiff testified that the children are very fond of Coen and show their affection for him in many ways; that he takes them to places of amusement and buys them presents. He testified that he was very fond of both children, approved plaintiff's desire to have their custody and was willing to assume any responsibility which might come from the children making their home with plaintiff and himself.
Plaintiff testified as to several ways in which she personally disapproved of the way in which the defendant and his family had treated the children during the time that they were with the defendant. Plaintiff said that the children played with no one at all so far as she knew, and were forbidden to play with her sister's children, but defendant's evidence showed that while the children were with defendant they played with a number of other children in the neighborhood, even including the children of plaintiff's sister. Plaintiff said that Catherine Ann's dresses were lengthened and made too long, but defendant's evidence showed that on account of the plaintiff herself not having done this, it had been the custom of defendant's mother and aunt to lengthen Cathie's dresses, and as soon as the plaintiff disapproved they ceased to do it. Plaintiff said that Cathie was forced to wear flannel pajamas instead of a silk nightgown. The defendant's evidence showed that this was her choice. Plaintiff complained that Cathie had been taught to kneel when saying her prayers. Defendant's evidence explained that this was the custom in the Watkins home because they are Episcopalians, but it was not forced on Cathie. Plaintiff said that the children were allowed to remain in swimming for five hours one day but defendant said this was not the case. Plaintiff said that Cathie's hair had been combed straight when it had previously been in pigtails, which was denied by defendant. Plaintiff said that Tommie was told to bite and not lick ice cream cones, which defendant said was done for the purpose of keeping him from letting the cones drip on his clothes. Of these complaints, the trial court, in summing up the evidence and announcing his ruling, said that they were of a trifling nature and, in the light of the testimony, had been completely dissipated.
It was admitted by plaintiff herself and by plaintiff's counsel, at her request in open court, that the defendant was a person of good reputation and good conduct.
Defendant is 33 years of age, a lawyer and a member of the firm of Watkins and Watkins. His evidence showed that he lived with his father and mother in a good neighborhood in St. Joseph, Missouri. This home has four bed-rooms thus furnishing separate rooms for the children, for the defendant and for the grandparents. The school facilities are excellent. The home environment is good. The grandparents, Mr. and Mrs. O. W. Watkins, Sr., and the *781 defendant's aunt, Mrs. Cornell, who visits the Watkins home frequently, all testified as to their love of the children, and as to their willingness to take care of the children while the defendant is away from home during business hours. The children are devoted to their father, their grandparents and Mrs. Cornell. Mr. Watkins, Sr., testified: "I have never seen greater affection displayed than the children show for their father." The grandparents have become stricter with the children since they have begun to share in rearing them. Defendant is amply able to care for the children and spends practically all of his nonworking hours with them. The children are taken to Sunday School regularly.
The court admitted evidence of misconduct between plaintiff and Coen prior to the decree of divorce solely as it bore on the present husband and present home of plaintiff into which she proposed to take the children if given their custody.
The evidence which the court admitted concerning the association and misconduct of Coen with plaintiff may be classified as to several occurrences. First is what may be called the Chicago occurrence. As to this, the uncontradicted evidence showed that plaintiff went alone from St. Joseph to Chicago and registered at the Blackstone Hotel there. Coen, living in Kansas City, went to Chicago at the same time as the plaintiff and, they said, without prearrangement and solely by accident, met there in the lobby of the Blackstone Hotel. The plaintiff registered into the Hotel on May 2, 1947, at 10:23 a.m. Coen registered in the same hotel at 10:26 a.m. The plaintiff said she met Coen at the desk, but Coen said he did not see plaintiff at the desk. However, the serial number of their registration cards and their accounts were consecutive, indicating consecutive registrations. Plaintiff registered by herself and took a single room. Coen registered as M. J. Coen and wife and took a double room, although his wife was not then in Chicago and never intended to be in Chicago at that time. Coen's explanation for this registration is that he went to Chicago intending to share a room with his boss, "but one of his bosses went to the Congress Hotel and the other boss did not go, so that Coen had to take a double room and register for two people in order to get accommodations at the Blackstone. It is admitted that the plaintiff and Coen went to a show together on Saturday night, May 3. They said that after the show she went to her room and Coen went to the Congress Hotel to see his boss. The boss was not called as a witness.
The uncontradicted evidence further shows that on this Saturday night the defendant's father, O. W. Watkins, Sr., was taken to the hospital and defendant attempted to get in touch with his wife by long distance telephone calls. He tried until 2:00 or 3:00 a.m., Sunday morning May 4, and again at 6:00 a.m., but was unable to find her in her room. Plaintiff's parents were notified of this and her father called a friend in Chicago to have the friend try to locate plaintiff. The defendant called both the Chicago police and the St. Joseph police to assist. Neither of plaintiff's parents testified in this case.
Defendant never succeeded in getting in touch with plaintiff, but she wired him that she was coming home. She checked out of the Blackstone Hotel at 10:26 a.m., on May 4, and Coen checked out at 10:22 the same morning. The plaintiff took a plane back to Kansas City and Coen says that he came on the plane with her. Defendant and plaintiff's brother-in-law, Robert Chesney, met plaintiff at the Kansas City Airport. Coen admitted that he did not walk out of the plane with plaintiff, but said that he saw and spoke to Chesney and the defendant, who acknowledged the greeting. The defendant denied having seen Coen leave the plane with plaintiff. Plaintiff's brother-in-law, Chesney, did not take the stand.
The second instance may be designated as the Denver occurrence. Plaintiff went to Denver and registered at the Cosmopolitan Hotel there on July 22 or 23, 1948. She admits knowing that Coen was at Goodland Kansas. She wired the defendant on July 23, which would be Friday, as to where she was staying. This was defendant's first information on the subject. Coen says that defendant telephoned him and told him that plaintiff was in Denver and implied that he would like for Coen to see her. Coen says that this conversation *782 occurred in the middle of the week. The defendant denies any conversation with Coen at this time and testified that he gave Coen no information as to his wife being in Denver, and that he would not have done so because by this time relations between defendant and plaintiff were strained on account of Coen. Defendant places the telephone call he had with Coen as a few days prior to a telegram following up the call. The telegram was dated August 13, 1948. It is admitted that Coen was in Denver Saturday night, July 24 and could not remember where he stayed except "probably the Brown Palace." He says that he called plaintiff that night by local phone and saw her the next day, Sunday, the 25th. They admit that they went together to the home of Mrs. Laura Darnell twice to see about the renting of an apartment in Denver. Mrs. Darnell says that Coen was with plaintiff both times, once when they came to look at the apartment and again when they returned to say that plaintiff would take it.
The third occurrence is really a series of occurrences taking place in Kansas City while plaintiff and defendant were married and while Coen was married to his then wife. Plaintiff and Coen admit a number of meetings in Kansas City. The evidence further shows that on several occasions when the plaintiff and defendant went to Kansas City Coen would appear at the place where plaintiff and defendant were, and would join the party, although to defendant's knowledge there had been no pre-arrangement or invitation to Coen.
Plaintiff and Coen admit several meetings in St. Joseph, Missouri, prior to either divorce.
The decree of the court was that defendant should continue to have the custody of Thomas Dodd Watkins, and that the custody of Catherine Ann Watkins would be taken from plaintiff and awarded to defendant with the rights of visitation to the plaintiff in the City of St. Joseph, where the court felt that such visitations would be away from the influence of Coen. From this decree plaintiff has appealed.
The rules of law governing appeals in cases involving the custody of children after a divorce are well settled. However, one examining the many reported cases of this kind finds that they rest, more than all others, upon the facts and circumstances of each particular controversy.
It is the duty of this court, in a proceeding of this nature, to review the evidence and render such judgment as we think proper under the law and the evidence. In other words, we are not bound by the finding of the trial court. However, it is also the settled rule that the finding of the trial judge on motion to modify should not be lightly disturbed, and should, in fact, be deferred to, unless it is apparently in conflict with a clear preponderance of the evidence and discloses a manifest abuse of judicial discretion.
Was the finding of the trial court in conflict with a clear preponderance of the evidence? We think not.
Under our decisions, there must be substantial evidence of new facts and changed conditions to authorize the modification of the original decree. Shepard v. Shepard, Mo.App., 194 S.W.2d 319, loc. cit. 323, citing many cases.
In the case at bar, the original decree of divorce awarded the custody of the little boy to defendant. As to the boy, plaintiff did not show any change of condition, especially not one that would make it to the best interest of the boy to have any change made in the order touching his custody. The defendant's position continued exactly the same as it was at the time of the divorce. He was then and still is a person of good conduct and reputation, the successful party in the divorce case, the innocent and injured party.
Of course, there was a change, in that plaintiff moved from St. Joseph to Kansas City and re-married, but this was not a "change of condition" with respect to the boy because the removal to Kansas City and the marriage of plaintiff would not in any way effect him in the custody of defendant. Plaintiff may still visit him as before, and her moving does not make it for the welfare of the boy that he also be moved, nor does her moving give her *783 any additional rights as to his custody that were not present at the time of the decree.
As far as plaintiff is concerned there was no real change since the decree because it is a fair inference that at the time of the decree she was planning to move to Kansas City and marry Coen. The dates and rapid sequence of events justify this inference. Her divorce was on November 15, 1948. Coen's divorce was on February 10, 1949. In March plaintiff, with Coen's aid leased the apartment in Kansas City. On April 1st, she moved to Kansas City and on April 22nd married Coen.
But as to the little boy there was no evidence of any change of condition relative to him or his interests. As said in Hawkins v. Thompson, Mo.App., 210 S.W.2d 747, loc. cit. 752.
"A mere change in conditions alone will not justify modification. It must also be such a change as will beneficially effect the interests of the child."
With respect to the little girl, there was a change of conditions shown which made it to her best interest that her custody be awarded to her father. One very important change of condition occurring since the decree of divorce was that plaintiff married Coen, the man who had broken up the home of plaintiff and defendant, and had caused his own wife to divorce him.
A second was that plaintiff moved from St. Joseph to Kansas City, and this was an important change because of the fact that the original decree was on the ground, among others, that plaintiff did not take care of the children; that she was away from home for long periods of time; that frequently she did not cook for the children and that she threatened to leave the defendant and the children. As long as the little girl remained in St. Joseph defendant would have ample and quick opportunity to observe her care and needs.
A third change of condition shown was that plaintiff was going to have a child born to herself and Coen. This would make defendant's children clearly and definitely stepchildren in Coen's mind, and could have a similar effect with plaintiff. The trial court thought this fact significant and commented on it in his findings saying: "It might or might not change the affection which would exist between the plaintiff's present husband and the little girlsometimes it does not, but more often it does."
In his finding the trial court recognized the law applicable to matters of this kind, namely: First, that the welfare of the child is the guiding star and, second, that a small child is usually not taken from the custody of the mother, but can be if the court finds the mother is not the proper person to have the child under the conditions existing. The trial court found and, we think, correctly, that the conduct of plaintiff and Coen in Chicago and Denver was improper. In view of this, what is wrong with a ruling which denies plaintiff the right to take the children into the home of which Coen would be the head? As said by this court In re Steele, 107 Mo.App. 567, 81 S.W. 1182: "While courts recognize and appreciate the claim of the mother to her child, yet no mere sentiment is allowed to overcome a consideration for the welfare of the child itself."
The cases cited by plaintiff which hold that the court should not base its decision upon a desire to punish the wrongdoer and reward the other party, are not applicable to the facts of this case. Here there was no question of punishing the plaintiff by the trial court. It simply decided that custody with the defendant was for the best interests of the children.
Nor are plaintiff's cases relating to the rule that courts will not refrain from granting permission for children to be removed even out of the state, if their best interests warrant it, applicable on the facts. The trial court was not governed in any respect by a desire to keep the children in St. Joseph, but ruled that the best interests of the children would be served by an award to defendantwho just happens to reside in St. Joseph.
In the last analysis it is apparent that the trial court took no gamble with the *784 future of these children and did not lend itself to the sanction of an experimental arrangement.
In the Coen home the children would have parents whose past conduct cannot be condoned, because each of them has transgressed the basic moral principles of two marriages. The attitude of parents in their lives is what they pass on to their children in rearing them. Parents who themselves do not follow the approved rules of conduct cannot be expected to impress the children with the necessity of doing so.
On the other hand, in the Watkins home there is none of this background and the children will, of a certainty, be reared with high moral and spiritual ideals. We do not believe that these children should be taken from a home where their welfare is assured, and placed in a home where their welfare, to say the least, is doubtful.
The experienced trial judge was manifestly right in his observation, referring to the Coen home, that: "I do not believe it would be a proper place under all the circumstances to take small children. The conditions which have once existed might or might not exist again and in other quarters and under other circumstances and I cannot believe the court would be justified in placing these children or either of them in that home."
The judgment of the trial court should be affirmed.
DEW, P. J., concurs.
CAVE, J., not participating.