244 S.W.2d 415 (1951)
MAYO
v.
MAYO.
Nos. 21622, 21639.
Kansas City Court of Appeals, Missouri.
November 5, 1951.
Myer M. Rich, Isadore Rich and Rich & Rich, all of Kansas City, for appellant.
W. B. Ennis, Kansas City, for respondent.
SPERRY, Commissioner.
Fern Mayo, plaintiff, sued her husband, Marvin T. Mayo for divorce, custody of their child, and for alimony, suit money, attorney fees, and maintenance for said child. Judgment was for plaintiff. Defendant appeals from the judgment, except that part granting plaintiff a divorce.
Plaintiff came from Kirksville to Kansas City to live with her aunt, when she was 15 *416 years of age. She and defendant were married 2 years later, defendant then being 17 years of age. Since their marriage they have lived in a home owned and occupied by defendant's father and mother, grandmother and an unmarried aunt. Defendant's father is now dead. A child, Judith Ann, was born in 1947.
Plaintiff left the home on two occasions prior to the last separation, which was September 10, 1950. On that date she went to the home of her sister, Mrs. Burkhart, and this suit followed. The child remains in the home of defendant (who is now in military service) and is being cared for by her grandmother, great-grandmother, and a maiden aunt. Defendant contends that plaintiff is not a fit person to have care and custody of the child because of her mental condition.
We will review the evidence and reach our own conclusions therefrom; however, we will defer largely to the findings of the trial judge where there is irreconcilable conflict in the evidence. Taylor v. Taylor, Mo.App., 224 S.W.2d 412, 416; Parks v. Cook, Mo.App., 180 S.W.2d 64. The controlling factor in arriving at our decision will be the welfare of the child, which is superior to the claim of either parent. McPhail v. Houghtelling, Mo.App., 225 S.W.2d 162, 165.
There was strong evidence tending to prove that defendant has dated other women frequently. The evidence also tended to prove that he is not a steady worker and has exhibited a low earning capacity. He had contributed to the family budget only $10 per week during his married life. He is now in military service, but if he were not in such service, it is conceded that the child would in fact, be under the care of defendant's mother, aunt, and grandmother, the first two being employed and away from home a major portion of the time; and the grandmother is almost 80 years of age.
It appears, from the evidence, that the child's best interest requires that her custody be awarded to plaintiff if she is a suitable person. Defendant's contention that she is not a suitable person to have custody, is based on evidence of a previous mental disorder, for which she received shock treatments. He contends that she has not fully recovered.
Much evidence was offered, by both parties, on this issue. Dr. Day, an osteopath, stated that, in his opinion plaintiff was mentally unsound and not capable of properly caring for the child. However, he had not seen plaintiff since she underwent shock treatments.
Dr. Cooper treated her at General Hospital, where she was given shock treatments. He stated that she thought she heard men outside of her window with a bomb; that she had auditory hallucinations, paranoid type of schizophrenia; that he regards one as a schizophrenic who believes that he hears, sees, or feels something when, in fact, he does not; that the cause of the disease is not fully known but that plaintiff's home life probably aggravated it; that medical authorities differ as to whether or not the disease is curable. He stated that he is not a specialist, or a fully qualified authority on mental diseases.
Defendant, and members of his family, testified to the effect that, on one occasion when plaintiff left the home, she took with her the child, who was very ill, and was taking penicillin; that she kept her for several hours, administered no medicine and gave her no food except an ice cream cone; that the first night she returned home, after the child was born, she gave the baby to defendant's Aunt Dee and has never taken care of her since that time; that plaintiff has never taken care of the baby; that, when she left home on September 10, 1950, she did not take the baby and made no inquiry about her until several days thereafter. It is urged that the above testimony strongly indicates mental unfitness.
Mr. Koelmel, formerly a member of the police department, for many years, has lived across the street from defendant's home. He is a cripple and spent much time on his front porch; he observed plaintiff and the family; plaintiff cried a great deal because of her unhappy home life; he heard defendant's mother tell plaintiff that she didn't have enough brains to take care *417 of the baby or to do housework; he has seen defendant on Cliff Drive with various women on several occasions; defendant has told him of his amorous conquests; he believed plaintiff to be a normal person, "above average."
Mrs. Siegel, about 50 years of age, lives back of the Mayo home. She has been in the home, and plaintiff has been in her home with the baby; she likes the Mayo family; has seen plaintiff in the back yard caring for the baby many times. She stated that she believes plaintiff is normal mentally and a good mother. She has seen her sit on the porch with the baby and cry.
Mrs. Izaby lives two doors east of the Mayos. She stated that she did not think defendant is a good husband or father; that he went out nights without his wife; that plaintiff took care of the baby and she thinks she is normal mentally.
Plaintiff's aunt, Zola Miller, stated that plaintiff has never visited her home with the baby except when "Aunt Dee" accompanied her; that witness never visited the Mayo home except once, because she thought the Mayos did not want her; that on an occasion when plaintiff left defendant, he came to talk to plaintiff, at her sister's home, and told plaintiff that if she would come back to him he would get a job and make a home of their own; that the next day after plaintiff left, September 11, she went with plaintiff to the Mayo home to visit the baby and no one answered the front or back door although some one was at home.
Mrs. Koelmel, mother of a previous witness of that name, is 73 years of age. She stated that she lives near the Mayo home and spends a great deal of time at her son's house; that plaintiff takes good care of the child; that she is mentally capable of caring for the child; that defendant goes out without his wife a great deal; that witness would not want to give up her baby but that some things might cause one to do so.
Mrs. Burkhart, plaintiff's sister, has no children at home. She stated that plaintiff was living at her home; that she would provide a bedroom there for her and the baby; that they live in a five room modern home, near school. Both she and her husband are employed and Mr. Burkhart stated that he would welcome plaintiff and the baby in their home.
Mrs. Vanderaa stated that defendant is a nice boy but "not very competent"; that he was always either looking for a job or had a new job; that plaintiff is efficient at housework and was not at all nervous before her marriage but that she has noticed a growing nervousness during the last year.
Mr. Hake has lived next door to the Mayos for 27 years. He stated that defendant never had a job longer than six or eight months, and was frequently out of work for long periods of time; that defendant's mother, Mrs. Mayo, and "Aunt Dee" Moody are employed during the day.
Mrs. Bass, 60 years of age, lives two doors east of the Mayos. She stated that she had seen plaintiff and the baby in the yard a great deal prior to the separation but that since that time she very seldom sees the baby; that the baby is kept indoors all day with the 80 year old grandmother; that she considers plaintiff to be normal mentally, of sound mind, and a wonderful mother, with good ideas about children. She also stated that defendant is irresponsible and without ambition.
Plaintiff testified at great length and underwent a strict and extended cross examination. From her testimony, and from that of other witnesses it appears that she has very little freedom in the home; that the other women do not permit her to look after the baby; that she believes defendant goes out with other women; that she is very unhappy because she has no home of her own and is not permitted to take her baby out with her, or to care for her in the home. In answer to a question by the court she stated that she would be willing to live with defendant if he would provide a home away from his family, but defendant, in open court, stated that he would not live with her.
The court heard the testimony, and saw the witnesses. He observed plaintiff on the stand, and expressed a belief that probably her mental condition may have been caused, or aggravated, by unhappy home *418 conditions. He stated that the only thing that caused him to hesitate about awarding custody to plaintiff was that no really competent medical evidence had been offered regarding her mental condition at the time of the trial. By agreement of counsel the court ordered plaintiff to be examined by Dr. Bills, a recognized authority in the field of mental illness. Dr. Bills prepared a written statement of his findings, which was filed and is in evidence. He stated that plaintiff exhibited no evidence of any psychosis or pre-psychotic tendencies; that she is mentally competent but slightly immature; that she is capable of caring for the child.
Dr. Bills' report is criticised because he failed to take into consideration plaintiff's hospital record and shock treatments. However, the lay testimony, regarding plaintiff's mental condition at the time of the trial was, preponderantly, to the effect that she was normal and fully capable of caring for the child. Dr. Bills' statement corroborates that testimony. The testimony of defendant and members of his family was in sharp conflict therewith. In such circumstances we are inclined to defer to the judgment of the trial court on the matter of custody.
Defendant complains that the allowance for attorney fees, for this appeal, is excessive. Defendant was earning $45 per week at the time of the trial, and he is now in military service with, probably, not a high salary. An allowance of $300 had been made for attorney fees in the trial below, and the additional allowance of $300 for this appeal, making a total of $600 for the entire case, is, we think excessive. Attorney fees for this appeal, in the amount of $300, should be reduced to $150.
The judgment should be affirmed, in every respect, except as to attorney fees, as to which it should be reversed and remanded with directions to modify the judgment in accordance with this opinion. Costs of appeal should be assessed against defendant-appellant.
BOUR, C., concurs.
PER CURIAM.
The foregoing opinion of SPERRY, C., is adopted as the opinion of the court. The judgment is reversed and remanded with directions to modify the judgment in accordance with this opinion. Costs of appeal are assessed against defendant-appellant. All concur.