248 S.W.2d 53 (1952)
TOLER
v.
ATLANTA LIFE INS. CO.
No. 28328.
St. Louis Court of Appeals. Missouri.
April 15, 1952.
*54 Henry D. Espy, St. Louis, for appellant.
Silas E. Garner, St. Louis, for respondent.
ANDERSON, Judge.
This is an action on a policy of life insurance which was issued by defendent, Atlanta Life Insurance Company, upon the life of Chris Tolar, now deceased, hereinafter referred to as Chris Toler. Plaintiff, Pinkie Toler, the widow of the deceased, sued as beneficiary named in the policy.
The case was originally filed in the Magistrate Court. A trial in the Magistrate Court resulted in a judgment for plaintiff. Thereafter, an appeal was perfected to the Circuit Court where the cause was tried by the Court without a jury. The trial in the Circuit Court resulted in a finding and judgment for defendant. From this judgment, plaintiff has appealed.
The policy was issued on November 15, 1948. The insured died August 17, 1949. The face amount of the policy was $750.
In the application for said policy certain questions and answers appear which defendant by its answer sets up as a basis for a plea of fraud and misrepresentation. Said matter appearing in the application is as follows:
"14. Date of last illness 1921
"15. For what treated Broken Arm
"16. Present condition of health Good
"17. Ever had any chronic or venereal disease No.
"State every doctor you have consulted in last 5 yrs. None
"I hereby certify and guarantee that all of the foregoing answers are true and I agree that they shall form the basis and consideration for the issue of a Policy to me by the Atlanta Life Insurance Company, and if the said answers are untrue that the said Policy shall be void and all monies paid thereon shall be forfeited to the company."
The answer of defendant alleged that the foregoing answers to the questions contained in said application were false; that said insured was not in good health at the time of his application for insurance, but was at said time suffering from cancer of the stomach, which said disease caused or contributed to his death; that insured had consulted a physician during the five years next before the date of said application; that the defendant relied upon the statement of the insured as to the condition of his health and as to whether or not he had consulted a physician within five years, and issued the policy to him upon faith in said statements. It was further alleged that defendant would not have undertaken the *55 risk had it known said statements were false.
The policy contained the following sound health provision:
"This policy shall take effect on the date stated in the schedule, if the insured is then alive and in good health."
The date stated in the schedule of said policy was November 15, 1948.
Defendant, as a further defense to this action, relies upon a breach of the foregoing sound health warranty.
Plaintiff, by her evidence, made a prima facie case. Defendant then offered in evidence the deposition of Dr. W. T. Gueno. Dr. Gueno testified that he first attended insured on July 16, 1948, at the latter's home. He stated that insured on that occasion complained of pain in the epigastrium, and gave a history of vomiting. The doctor at that time considered that insured's condition might be gastritis, peptic ulcer, or possible malignancy. He stated that insured seemed to be in considerable pain, which insured stated was of recent origin. The doctor then ordered insured to have an X-ray examination made.
Dr. Gueno further testified that he again saw the insured at the latter's home on July 23, 1948, at which time insured made the same complaints as he had on the doctor's first visit. He stated that he noticed no improvement in insured's condition over what it was on the first visit. Two days later an X-ray examination was made by Dr. Bell which showed, according to the testimony of Dr. Gueno, that insured had "signs of pre-pyloric changes in the stomach that had the appearance of a carcinoma." Dr. Gueno stated he saw the patient thereafter at irregular intervals; that he would drop in to see insured occasionally, and that insured was in his office once. The doctor stated:
"It was one of those conditions where there was no point in going to see him. Surgery was the thing of choice, and unless you were going to do that there was not much to be done. * * * His condition was a type that it was a matter of doing the best you could. You had to exercise the best judgment you could and that judgment might not be the best for the patient. It was a difficult decision to make.

* * * * * *
"Q. Well, anyway, Doctor, when you received that report you considered this a case involving cancer of the stomach? A. That is why I signed it, `possibly malignancy,' and I put it up to him. That is a case where you have to put it up to your patient. You let him know where he stands."
Dr. Gueno saw the patient occasionally thereafter until March, 1949, when insured entered the Barnes Hospital for an operation. During that time Dr. Gueno administered morphine to relieve insured's pain. Insured's condition did not show any improvement. In fact, he seemed to get worse; he grew weaker and lost weight. The doctor told him to stay in bed. In fact, according to the doctor's testimony, insured was too weak to do anything else. The doctor stated:
"Well, he was in bed when I saw him in July, and frankly, he stayed in bed practically most of the time from then on. * * * When I say in bed, he was confined to the house. Of course, he could get up and exercise around, but he had to lie around and take things easy.
"Q. * * * Well, did you see him as often as once a week? A. Well, for a while, yes. Mr. Jones, it wasn't necessary. There are some practical considerations. There was no point in trying to collect a fee. * * * I was prescribing for him. It was not necessary to go to examine him; I knew what he needed. Once a week I prescribed for him and signed his disability claims.
"Q. And what did you prescribe for him? A. I said sedative medicine, and that was what the prescription consisted of; every week he got it. This is the same prescription for any cancer case for the relief of pain through narcotics."
Dr. Gueno testified that he told Mrs. Toler what her husband's condition was in *56 July, 1948, when he received the X-ray report from Dr. Bell; that he did not recall when he told insured of his condition, but "he was in here one day, and he finally wormed it out of me."
The doctor further testified that he did not make an examination of the insured after insured returned from the hospital for the reason that insured seemed to improve some after the operation; that insured was able to retain his food, which was something he was unable to do prior to the operation. After the operation, Dr. Gueno saw the patient on April 25th and May 2nd. On April 25th there was a change in insured's condition. From that date until he died, August 17th, insured complained of pain, which grew continuously worse, during which time he had to have medicine. Dr. Gueno further testified:
"Q. * * * would you please summarize his condition from the time you saw him on March 10th to the day he died? A. Well, frankly, to be fair to everybody concerned, that is a question that ought to be answered by the Barnes Hospital because, after all, mine is an opinion. I could not swear under oath what Chris Toler had. I have only the X-ray findings; I didn't see the pathological material from the operation; I didn't see the operation, what was found, but my diagnosis was based on the symptoms the man complained of, the clinical history, and the X-ray picture, and my opinion was that he had carcinoma of the intestine, as I said; as I signed the blank, possible gastric malignancy, a malignancy of that type, including the stomach and intestines. I don't know what type of operation was performed, but he was subjected to surgery. He had probably a two months' improvement, and then he gradually began to go down very rapidly."
Dr. Gueno called at insured's house a few days before insured died. The doctor testified that at that time,
"his condition didn't seem any more critical than what it had been before that time. He had been vomiting; he vomited in my presence then. His pain was so severe I had to give him hyperdermics to ease the pain. I would say he was very painfully ill, but not that he looked like he was going to die; and the next time I saw him he was dead. * * * He died on the 17th of August, 1949. * * * I signed the death certificate as intestinal obstruction * * * we can't make a completely accurate diagnosis as to the cause of death. You have to assume that something he had prior to that time contributed to his death."
Dr. Gueno further testified that his opinion as to the cause of insured's death was based on the insured's history, his own diagnosis, and the X-rays; that there is no way of definitely determining the cause of death without an autopsy; that there was no autopsy in this case; that in the death certificate he gave intestinal obstruction as the immediate cause of death, and cancer of the stomach and metastases as associated diseases. He stated:
"This diagnosis was that the cause of death was an intestinal obstruction, and associated with that, or perhaps contributory to that, was metastases post-operative of this carcinoma of the stomach. * * * Chris Toler had this pain in the stomach, and his vomit looked like bowel movement. That was the picture that would lead anyone to believe that there was an intestinal obstruction. * * * What I say about Chris Toler is I think he died of an intestinal obstruction, but the metastases had something to do with it."
Pinkie Toler testified that her husband was confined to his bed three days before he died; that just prior to that he had been on a hunting and fishing trip; that after he came out of Barnes Hospital in March he went fishing and drove a taxi cab; that he was released from Barnes Hospital on March 31; that the attack of intestinal obstruction was on Saturday before he died; that he went hunting and drove sixty miles to Sparta, Illinois, and came back at 7:30 o'clock that night, at which time he was ill, and that he died three days later.
*57 Mrs. Toler further stated that Dr. Gueno did not tell her husband that he had cancer. She also testified that the doctor did not tell her that insured had cancer until February, 1949. She further testified as follows:
"Q. Other than the time your husband was at Barnes Hospital and the three days before his death, was he confined to his bed any time with sickness? A. No.
"Q. What was he doing during that time? A. He was driving a taxi. * * * Two weeks after he came out of Barnes Hospital after the operation he started driving a taxi. * * * He drove up to that Saturday before his death.
"Q. Had he been driving before he went to Barnes Hospital? A. Yes, sir."
The records of Barnes Hospital show that insured was operated on for cancer of the stomach. After his discharge from the hospital insured returned to Barnes Hospital Clinic on April 4, 1949, May 12, 1949, and June 23, 1949.
Mildred LaGrave, Medical Secretary for Barnes Hospital, read in evidence the record of Barnes Hospital Clinic relative to these visits, as follows:
"Saw patient in emergency room following discharge after total gastrotomy. Complains of distention RX with paragoric orekolnic. On May 12th, 1949, patient was seen in the tumor clinic; patient still has some weakness and edema, but otherwise has a perfect result in that he is free from pain, able to eat a regular diet and otherwise lead a normal life. Return in six weeks. He came in on June 23rd, 1949. I wouldn't say he came in, it says `spoke to wife about patient and he is apparently going down hill rapidly. He is being cared for by local physicians, patient to return in six weeks.' That is the last note in the chart."
Defendant also offered in evidence claims for benefits for total disability filed by insured with the United Insurance Company and the Washington National Life Insurance Company. These claims were for weekly benefits and each one was supported by a certificate of Dr. Gueno. The first claim was dated "7/16/48". In the first four weekly claims the doctor gave as his diagnosis "acute gastritis". In the claim dated August 13, 1948, and in several of the weekly claims thereafter filed, the doctor gave as his diagnosis "acute gastritis, post gastric malignancy." In the claim dated October 2, 1948, the diagnosis appears as "carcinoma of the stomach." In the weekly claims filed thereafter the diagnosis appears as "post gastric malignancy."
Appellant's first point is that the court erred in admitting in evidence, and considering, the insured's application for the policy. The basis of appellant's objection to this evidence is that the defense predicated upon alleged misrepresentations contained in said application is not available to respondent because said application was not attached to said policy, or the substance thereof endorsed on said policy, as provided by Section 377.350, RSMo 1949, V.A. M.S. Said section appears as a part of Chapter 377 of the Revised Statutes of 1949, V.A.M.S. which provide for the organization and regulation of insurance companies doing business on the stipulated premium plan. It has been held that said section has application only to policies issued upon the stipulated premium plan. Craig v. Metropolitan Life Ins. Co., 220 Mo.App. 913, 296 S.W. 209; Mattero v. Central Life Ins. Co., 202 Mo.App. 293, 215 S.W. 750. It does not appear that the policy here sued on is of the kind subject to the provision of Section 377.350, supra. The court did not err in admitting said application into evidence.
Appellant also contends that the court erred in admitting in evidence the Barnes Hospital records concerning the care and treatment of Chris Toler. This evidence was clearly admissible on the issue of fraud raised by respondent in its answer. It was not rendered inadmissible, as contended by appellant, by reason of respondent's failure to attach a copy of the insured's application to the policy.
*58 Appellant next complains of the admission in evidence of a report of the Retail Credit Company, made after an investigation of the facts pertaining to respondent's liability under its policy. The report detailed information obtained by the investigator from an interview with Dr. Gueno, information obtained from the widow and insured's neighbors, and copies of the Barnes Hospital records. The information all tended to support a belief that the policy was obtained by fraud. A. D. Browning, respondent's District Manager, testified that the rejection of appellant's claim was based upon the information contained in this report. The evidence was admitted on the issue of vexatious refusal to pay. It was admissible on such issue. Scott v. Missouri Ins. Co., Mo.Sup., 233 S.W.2d 660.
Appellant next complains that the court erred in admitting in evidence a written instrument signed by plaintiff authorizing Barnes Hospital and the Washington University Clinic to permit defendant to make an inspection of their records with reference to the care and treatment of Chris Toler. This evidence was offered to show a waiver by plaintiff of the privilege of physician and patient as a foundation for the introduction of the medical evidence relevant to the issues. It was quite properly admitted.
Appellant contends that the sound health warranty contained in the body of the policy is ineffective because it is in conflict with the insuring clause which contains a definite promise to pay the death benefit upon satisfactory proof of death. There is no merit to this contention. The contract should be construed as a whole, and the language must be given its plain meaning. There is no ambiguity in the policy in suit which calls for a construction different from what its plain language calls for. Central Surety & Insurance Corporation v. New Amsterdam Casualty Co., 359 Mo. 430, 222 S.W.2d 76; Wendorff v. Missouri State Life Ins. Co., 318 Mo. 363, 1 S.W.2d 99, 57 A.LR. 615.
Nor is there any merit to the contention that defendant is precluded from invoking the sound health clause because the policy does not contain a forfeiture clause. The defense interposed was not that the policy was forfeited, but that it was void ab initio.
Finally, it is urged that the finding of the trial court is against the weight of the evidence, and the law under the evidence. Since this action was tried by the court without the aid of a jury, we must review the case upon both the law and the evidence, as in actions of an equitable nature. The judgment will not be set aside unless clearly erroneous. RSMo 1949, sec. 510.310(4), V.A.M.S.
The evidence in this case shows beyond doubt that the insured was afflicted with cancer at the time the policy was applied for and delivered. This appears from the testimony of plaintiff's own doctor. According to the doctor's testimony, he diagnosed insured's ailment as cancer in July, 1948, after having examined the X-ray report of Dr. Bell. The policy was applied for on October 19, 1948, and issued as of November 15, 1948. From July 20, 1948, to April 19, 1949, insured collected benefits from two other insurance companies based upon a claim of total disability due to the condition which Dr. Gueno found, in July, to be cancer. Dr. Gueno testified that insured's condition continued to get worse from the time he first saw him until he entered Barnes Hospital in March, 1949, where he was operated on for cancer of the stomach. Insured was released from the hospital on March 31, 1949, and for a short time seemed to improve. However, beginning about April 25, 1949, he began to exhibit the same symptoms that he had prior to entering the hospital. These symptoms continued until he died, August 17, 1949. Dr. Gueno gave intestinal obstruction as the immediate cause of death, and "cancer of the stomach and metastases" as associated with it. From the doctor's testimony, no other conclusion can be reached than that the cancer of the stomach spread to other parts of insured's body and was the cause of insured's death.
It conclusively appears that there was a breach of the sound health warranty contained *59 in the policy, and for that reason plaintiff is not entitled to recover. Kirk v. Metropolitan Life Ins. Co., 336 Mo. 765, 81 S.W.2d 333.
The judgment appealed from is affirmed.
BENNICK, P. J., and RUDDY, J., concur.