Agnes Vernie RAGAN, Plaintiff-Appellant,

v.

Elmer Lee RAGAN, Defendant-Respondent.

No. 7727.

Springfield Court of Appeals.

Missouri.

July 11, 1958.

Hayden C. Covington, Brooklyn, N. Y., for plaintiff-appellant.

John Hosmer, Haymes, Dickey & Dickey, Springfield, for defendant-respondent.

STONE, Presiding Judge.

In this divorce suit instituted by plaintiff, Agnes Vernie Ragan, the trial court entered a decree dismissing plaintiff's petition, granting a divorce to defendant, Elmer Lee Ragan, on his cross-bill, and awarding to defendant the care and custody of two minor children born of the marriage, to-wit, Sherry Jane, eight years old at the time of trial, and Robert Keith, then five years old, with reasonable visitation rights to plaintiff. On this appeal by plaintiff, the sole point properly preserved and presented for appellate review under Supreme Court Rule 1.08 [1] is that the trial court abused its discretion in awarding custody of the minor children to defendant.

Plaintiff and defendant (whose ages are not shown) were married in 1931 at Marlow, Oklahoma. In addition to the two young children whose custody is in controversy, the parties have two older sons, Elmer Lee, Jr., twenty-three years of age at the time of trial, who is married and lives in Springfield, Missouri, and Don, nineteen years of age, who resides with defendant at Fordland, Missouri. Defendant had "worked in the optical business" in Oklahoma and Texas from 1931 to 1946, and then had been on a farm for a brief period, before the Ragan family moved in 1948 to Fordland, a country community about twenty-five miles east of Springfield, Missouri. Since moving to Fordland, defendant has owned and operated a grocery and feed store. The family living room, dining room and kitchen are in the rear end of the ground floor of the store building, while the bedrooms are on the second floor of the same building.

In October, 1955, plaintiff became a member of a religious sect known as Jehovah's Witnesses (hereinafter referred to as the Witnesses). In May, 1956, she left her husband and children and thereafter remained separate and apart from them until October 25, 1956, when the family was reunited under circumstances shortly to be noted. During this period of separation, plaintiff engaged in the Witnesses' "activities" such as "missionary work" and "placing literature," but she found time to pursue two suits for separate maintenance against defendant. When the second such suit came on for trial on October 25, 1956, the circuit judge, distressed by the tragedy unfolding before him, patiently talked with the parties in his chambers, persuasively urged them to reunite "for the sake of the children," and hopefully effected what we shall refer to as a reconciliation. At that time, the parties entered into an informal "agreement" that (as paraphrased by plaintiff in its simplest terms) "I was to take care of the home and the children, and he (defendant) was to take care of the business." According to plaintiff, the spe-

---

1. All references herein to Supreme Court Rule 1.08 are to that rule (as amended), as it appears in the 1957 supplement to RSMo 1949, p. 1334, and in the 1957 pocket part to 42 V.A.M.S., p. 3, and in 365 Mo. appendix iii.

cific provision that (as she put it) "I was to have no part in the business" was prompted by her complaint about working long hours in the store; but, defendant said that he insisted upon this provision because of plaintiff's secret and unauthorized abstractions of cash from the store—"I couldn't trust her in the store no more." Plaintiff was to have "time out" to attend two meetings of the Witnesses each week, to-wit, a one-hour meeting for "Bible study" each Tuesday evening at a farm home two miles from Fordland, and a two-hour meeting each Sunday evening at Kingdom Hall in Springfield, but was not to participate otherwise in the Witnesses' "activities," which (so defendant charged) theretofore had caused plaintiff to neglect and abandon both her husband and their children.

However, the reconciliation was short-lived, indeed; and, within two or three weeks, tempers flared and trouble erupted again, by reason of plaintiff's alleged failure to respect the requirement of the informal reconciliation "agreement" that she "go directly from * home to the meetings" of the Witnesses and "return * * home immediately after the meetings." Defendant testified that "she (plaintiff) failed to get home until in the neighborhood of 11:00 o'clock" several nights. On an evening in November, 1956, *defendant* said that he "waited up" until 10:30 P.M., "went on to bed," heard no knock or telephone call, and did not see plaintiff until she returned home the following morning with the curt comment that "I would have been at home if you would have let me in" but with no explanation of where she had spent the night. *Plaintiff's* version of the incident was that she had "returned a little after ten," that there had been no response to her knocks on the locked door or to her call from the nearby telephone exchange, and that accordingly she had sought lodging for the night with neighbors of the same religious faith.

Summarized without unimportant detail, defendant's testimony was that, during the period from the reconciliation on October 25, 1956, to the final separation on January 20, 1957, plaintiff's mind was so occupied and her time was so consumed with the reading of religious literature and her religious activities that she failed to dress and feed the children properly, frequently left them "just running wild around the store"—"just doing whatever they wanted to do," and was so unconcerned about them that she "many a time" answered defendant's inquiries about the children with "I don't know—go see about them"; that she would not engage in conversation "without * running * right into religion" and attempting to answer every question "with scripture"; that she spoke disparagingly of "anyone by the name of Ragan" in general and of defendant in particular, because, not being Witnesses, they were "no ways near the same type and kind of people" but were "an altogether different class or breed"; that she told the children that, "if they listened to me (defendant), it was wrong and * * a lie"; and that, in short, she was "very cold and indifferent"—"a long ways from a wife" to defendant and not "motherly with the children."

The final separation followed an altercation on the night of Sunday, January 20, 1957, after plaintiff had returned from Springfield "around 10:30 or a little after." According to *defendant,* he was upstairs, "putting the kiddies to bed," when plaintiff knocked on the downstairs door. While he finished with the children, plaintiff "was apparently trying to kick the door down or beat it down." As he opened the door, defendant asked plaintiff "if she was in that big of a hurry why didn't she get home a little earlier, and she took a swing at my (defendant's) head with her purse." After both parties went upstairs, defendant went to bed immediately, but plaintiff "sat around" for five or ten minutes before walking to the foot of defendant's bed, where she "looked at me (defendant) good and hard a little while and said, 'you dirty s - - o - a b - - - -.'" When defendant "got up and * ' * walked around to where she

was at, she picked up the telephone * * * and jammed the telephone right at me." "I (defendant) pushed it right back * * * and she fell across the bed." Vigorously denying that he had beaten, struck or slapped plaintiff at any time, defendant said that, when plaintiff fell on the bed, the base of the telephone "fell out of her own hand" and struck her face causing the bruises and abrasions subsequently observed by witnesses. Defendant testified that plaintiff jerked the cord out of the telephone, "kicked and cried and hollered and acted like a five-year old kid for a while" (with all of the children, by then assembled, watching her), "slid off the bed into the floor * * * and set there a little bit, * * * took a look in the mirror, and said, 'this is good enough,'" and then left. Don (the nineteen-year old son) confirmed defendant's narrative in all material particulars. *Plaintiff's* version was that she reached home about 10:05 P. M. only "a few minutes late"; that, after some words about the time, "I shook my purse at him, and told him to let me in," whereupon defendant "come out and struck me, with my glasses on, and pushed me on upstairs into the bedroom"; that, in the bedroom, defendant "started in again" and struck plaintiff "with his fists," so she "ran to the telephone * to try to get some help, and all the time he kept beating me, and trying to take the 'phone away from me"; and that, "after this was over," plaintiff told defendant that she "was going to report him for it," got her things, and left.

Defendant stated that plaintiff "has a very high temper." Don testified that his mother "was always abusive" toward his father and "was always in a mad state of condition." And, two neighbor women related separate conversations with plaintiff in which she had said that "when she (plaintiff) got mad there wasn't nothing she wouldn't say or do." According to defendant, plaintiff "would hardly ever just talk" to one of the children—"she would slap them, kick them, * or something first, and

then tell them what she wanted." Both defendant and Don described an illustrative incident involving Robert Keith, the five-year old child. In defendant's language, "little Bobby set a water pitcher at the table, and didn't set it on there good, and it fell off, and she just screamed and said, 'you little devil,' and kicked him and cried and so forth for about an hour * * or more * * and slapped him a time or two because the kid made a mistake." In describing his mother's reaction to the broken pitcher, Don said that she "had a sort of a screaming fit, and kicked him (Bobby), and * went into a mad rage." Witness Heying, who worked at the Ragan store, testified that he had seen plaintiff "kick the children in the stomach, in the back"—"almost anyplace, it didn't make much difference, I don't think." Commenting that "I wouldn't want my children treated that way at any time," Heying sagely opined that "there is a place to whip them but I don't know as there is a place to kick them."

Three neighbor women (one living next door to the Ragan store, one living cater-cornered across the highway, and the third an employee in the store for six or seven years) staunchly supported defendant's assertion that plaintiff had neglected the children. Two of these neighbors had seen the young Ragan children playing on a nearby railroad right of way several times and had sent them home, and the third neighbor recounted an incident in which she "went and got Bobby * * off the highway and a big truck just barely missed him." All of this occurred while plaintiff was at home. Two of these witnesses also remembered the occasion when, with defendant away on business, Don had taken plaintiff to church in Springfield—"they thought Janie (eight years old) had got in the car already, and so they just got in the car and went on"; but, when they got to Springfield, they missed Janie so Don called a neighbor over long distance to "go hunt for her * * and take care of her until we get back."

Of prime significance in determining the issue as to custody of the two younger children is the persuasive and uncontradicted testimony of nine witnesses for defendant to the general effect that the children had better care while plaintiff was gone (i. e., from May to October 25, 1956, and after the final separation on January 20, 1957) than while she was at home. Included in this testimony were statements by four witnesses that the children were "kept cleaner" by defendant, by four witnesses that the children had "better manners" with defendant caring for them, by one witness that defendant "paid more attention" to the children, by another that "they are really much nicer children now," by another that "they are in much better care now," and by still another that they are "better children in lots of ways than they was when she (plaintiff) was there." Four witnesses confirmed defendant's testimony that the children did not attend Sunday School when plaintiff was at home but that, when she was gone, defendant sent them to Sunday School regularly. Since the first part of February, 1957, defendant has employed a neighbor woman to assist in caring for the home and children; and during March, 1957, for the same purpose defendant's parents moved into the living quarters above the store and, at the trial, stated their willingness and intention "to stay as long as he (defendant) needs us." Of the seventeen witnesses called by *defendant,* fifteen resided in the Fordland neighborhood, and the testimony of eleven pertained to care of the children. Of the six witnesses called by *plaintiff,* only two resided in the Fordland neighborhood. One of plaintiff's witnesses simply identified court files, and another was plaintiff's physician. The testimony of the remaining four witnesses for plaintiff (all of her religious faith) dealt primarily with her trips to meetings of the Witnesses. Although plaintiff herself positively and categorically denied all charges of personal misconduct and of neglect or mistreatment of the children, *not a single witness testified on her behalf on the all-important issue as to her care of the children.*

In view of the brash assertions of plaintiff's counsel here, the testimony of three other witnesses is noted. *Witness Potter,* a farmer who "played checkers" in the Ragan store and knew plaintiff, said that he saw her during October or November, 1956, drinking beer in a Springfield taproom with "somebody * setting by her." *Witness Rutherford,* who lived about nine miles southwest of Fordland and had traded at the Ragan store for three years, was returning from church between 10:00 and 10:30 P. M. on a Sunday night during December, 1956, when she came upon a parked, unlighted automobile on a "real narrow" and "lonely" country road in "Peck Holler." Fearful that she could not pass this parked automobile, Mrs. Rutherford "got out of my car and walked to the window" of the parked automobile for the purpose of asking the driver to move. The witness smelled "liquor or beer," saw plaintiff and an unidentified man in the parked automobile, spoke to plaintiff by name, and received an answering "hello." *Witness Peck,* who formerly lived near Fordland and knew the Ragans, said that "around three or four weeks" prior to the trial on June 3, 1957, he was returning from his sister's home to Springfield over a dirt road between 11:30 P. M. and midnight, when the headlights on his slowly-moving automobile shone on a parked, unlighted automobile, facing toward him. "I (Peck) seen Agnes (plaintiff) in it, and I thought Elmer (defendant) might have been there too, so I stopped and went up to the car, and I seen it wasn't Elmer, and just spoke to Agnes, and just turned around and walked back to my car, and took off."

■ The tenor of plaintiff's argument on appeal is exemplified by these bold, sweeping affirmations in the opening paragraph: "There is not the slightest suggestion that (plaintiff) was guilty of any immorality. The record nowhere even faintly suggests that she did not properly care for her chil-

dren. The evidence shows that she was diligent in providing them with religious guidance. * * * Nowhere can it be found in the record that she neglected her children." On this false premise (asserted in the teeth of a record fairly bristling with testimony to the contrary), plaintiff contends that, while "both parties were qualified" to have custody of the children, "lack of proof of disqualification made mandatory the award to the mother." But, sound and fury are sorry substitutes for fact and evidence, and plaintiff's counsel cannot, by his own bootstraps, lift himself and his client above the transcript here presented. Although our courts have said many times that, *"all other things being equal,"* custody of a child of tender years should be awarded to the mother [Long v. Long, Mo.App., 280 S.W.2d 690, 694(5), and cases there cited], the paramount and controlling consideration in every child custody case, to which all other principles and presumptions must yield, is the welfare of the child. I——— v. B———, Mo.App., 305 S.W.2d 713, 719(7). There is no paucity of cases demonstrating that, where the best interests of a child will be served thereby, custody will be awarded to the father;[2] and, clearly this should be and is true even where both parents are fit and proper persons to rear the child. Ballew v. Ballew, Mo.App., 288 S.W.2d 24, 26(6, 7).

■ As in the Ballew case, supra, 288 S.W.2d loc.cit. 26, instant defendant "is doing a good job and there is no evidence to the contrary." In fact, plaintiff concedes defendant's fitness to have custody, and numerous witnesses have attested to the ex-

cellent care which the children have had during plaintiff's absence. In the homely language of the old adage, "the proof of the pudding is in the eating"; and, with no indication that the best interests of the children would be served thereby, we are unwilling to experiment by changing their custody. The reported cases are legion in which it has been declared that the findings of the trial judge as to custody of a minor child, although not binding upon the appellate court, are nevertheless not to be lightly regarded and easily disturbed, but that the appellate court should and will defer to such findings unless it is firmly convinced that the welfare of the child requires some other disposition.[3] And, upon our independent and painstaking review of the entire record in the instant case [Section 510.310(4), RSMo 1949, V.A.M.S.] with primary concern for the welfare of the children involved [Graves v. Wooden, Mo.App., 291 S.W.2d 665, 667(1)], we are convinced beyond peradventure of doubt that the judgment of the trial court, awarding custody of the two children to defendant, was justified and proper, finds ample support in the evidence, and should not be disturbed.

■■ Plaintiff's only other point on appeal, to-wit, that "the judgment of the court below denied appellant (plaintiff) her rights of freedom of worship and of religion, contrary to Article 1, Section 5, of the Constitution of Missouri and the First and Fourteenth Amendments to the United States Constitution," reflects an ineffectual and forlorn attempt to inject a constitutional question into the case. In this juris-

2. E. g., Thomas v. Thomas, Mo.App., 288 S.W.2d 689, 697(11), certiorari denied 352 U.S. 873, 77 S.Ct. 98, 1 L.Ed.2d 77; Graves v. Wooden, Mo.App., 291 S.W.2d 665; Cadenhead v. Cadenhead, Mo.App., 265 S.W.2d 426, 437(11); Schneider v. Schneider, Mo.App., 248 S.W.2d 59, 61–62(3, 4); Brake v. Brake, Mo.App., 244 S.W.2d 786; Watkins v. Watkins, Mo. App., 230 S.W.2d 778; Rex v. Rex, Mo. App., 217 S.W.2d 391.

3. Clark v. Clark, Mo.App., 306 S.W.2d 641, 647(7); I——— v. B———, Mo. App., 305 S.W.2d 713, 720(8); Thomas v. Thomas, supra, 288 S.W.2d loc. cit. 697(10); Cadenhead v. Cadenhead, supra, 265 S.W.2d loc. cit. 437(10); Harviel v. Harviel, Mo.App., 247 S.W.2d 346, 347(2); Mayo v. Mayo, Mo.App., 244 S.W.2d 415, 416(1); Watkins v. Watkins, supra, 230 S.W.2d loc. cit. 782 (1); Lutker v. Lutker, Mo.App., 230 S W.2d 177, 179(2); Rex v. Rex, supra, 217 S.W.2d loc. cit. 393–394(3).

diction, it has been held time and again that to invoke appellate review of a constitutional question four requirements must be satisfied, i. e., (1) the constitutional question must have been raised at the first opportunity, (2) the constitutional provision claimed to have been violated must have been designated specifically, either by explicit reference to the article and section or by quotation of the provision, (3) the facts showing such violation must have been stated, and (4) the constitutional question must have been preserved throughout for review, including presentation in the motion for new trial and adequate coverage in the appellate briefs.[4]  In the case at bar, the first mention of a constitutional question was plaintiff's complaint in her motion for new trial that "the decision of the court was based upon plaintiff's religious beliefs, and she was therefore denied the religious freedom guaranteed to her both under the Constitution of the United States and the Constitution of the State of Missouri."  Passing the initial requirement that the alleged constitutional question be raised at the first opportunity, it is plain that the quoted assignment in plaintiff's motion for new trial, without specific designation of the constitutional provisions claimed to have been violated and without any statement tending to show how or in what manner or respect plaintiff's right of religious freedom was denied, constituted nothing more than a mere general averment of a conclusion and was wholly insufficient to raise and preserve any constitutional question.[5]

Furthermore, the point in plaintiff's brief on appeal that "the judgment of the court below denied appellant (plaintiff) her rights of freedom of worship and of religion, contrary to Article 1, Section 5, of the Constitution of Missouri and the First and Fourteenth Amendments to the United States Constitution," which does not suggest how or in what manner or respect plaintiff's constitutional rights were denied by the decree nisi *(in conventional form with no mention therein of religion or religious worship)*, presents no constitutional question for appellate review.[6]  This is par-

---

4.  State ex rel. Thompson v. Roberts, Mo., 264 S.W.2d 314, 317; State ex rel. Barnett v. Sappington, Mo., 260 S.W.2d 669, 671(6); Ingle v. City of Fulton, Mo., 260 S.W.2d 666, 667(1); Cirese v. Spitcaufsky, Mo., 259 S.W.2d 836, 838 (1); State ex rel. Kirks v. Allen, Mo., 250 S.W.2d 348, 350; City of St. Louis v. Butler Co., 358 Mo., 1221, 219 S.W.2d 372, 376(6); Deacon v. City of Ladue, Mo.App., 294 S.W.2d 616, 622(1); Baker v. Baker, Mo.App., 274 S.W.2d 322, 325 (6).

5.  State ex rel. Barnett v. Sappington, supra, 260 S.W.2d loc. cit. 671–672; Beck v. Kansas City Public Service Co., Mo., 37 S.W.2d 589, 590(2); Village of Grandview v. McElroy, 318 Mo. 135, 137–138, 298 S.W. 760, 761(7).  See, also, State ex rel. Kenosha Auto Transport Corp. v. Flanigan, 349 Mo. 54, 57, 159 S.W.2d 598, 599(3); Bieser v. Woods, 347 Mo. 437, 441, 147 S.W.2d 656, 659 (4); Metzger v. Metzger, Mo., 145 S.W. 2d 380, 384–385(4, 5); Robinson v. Nick, 345 Mo. 305, 309, 134 S.W.2d 112, 114(5); Crescent Planing Mill Co. v. Mueller, Mo., 117 S.W.2d 247, 249(1),

118 A.L.R. 709; City of Marshfield v. Brown, 337 Mo. 1136, 1139, 88 S.W.2d 339, 341(4); Wheat v. Platte City Ben. Assessment Special Road Dist. of Platte Co., 330 Mo. 1245, 1250, 52 S.W.2d 856, 859(4); Dorrah v. Pemiscot County Bank, Mo., 248 S.W. 960, 962(2); Bormann v. City of Richmond Heights, Mo. App., 213 S.W.2d 249, 251–252(3); City of St. Charles v. Union Electric Co. of Missouri, Mo.App., 185 S.W.2d 297, 303 (17); Houts on Missouri Pleading and Practice, Vol. 2, § 484 loc. cit. 237.

6.  State ex rel. Houser v. St. Louis Union Trust Co., Mo., 248 S.W.2d 592, 595–596(4, 5), certiorari granted 348 U.S. 803, 75 S.Ct. 22, 99 L.Ed. 638, certiorari dismissed 348 U.S. 932, 75 S.Ct. 354, 99 L.Ed. 731; Kansas City v. Reed, 358 Mo. 532, 537, 216 S.W.2d 514, 515–516(2); Robinson v. Nick, supra, 134 S.W.2d loc. cit. 114–115(11).  Consult, also, Gruet Motor Car Co. v. Briner, Mo., 224 S.W.2d 73, 76–77; Bealmer v. Hartford Fire Ins. Co., 281 Mo. 495, 505, 220 S.W. 954, 957(4).  Compare Village of Grandview v. McElroy, supra, 298 S.W. loc. cit. 761(7); Wheat v. Platte

ticularly true in view of Supreme Court Rule 1.08, which provides that appellant's brief *"shall* contain * * * the points relied on, which *shall* show what actions or rulings of the Court are sought to be reviewed and *wherein and why they are claimed to be erroneous,"* and which contemplates a particularization in statement of the points relied on.[7] (Emphasis ours) See Article 5, Section 5, Mo.Const. of 1945, 2 V.A.M.S. · "It is not sufficient to say, either here or in the trial court, that the judgment violates a certain provision of the Constitution, but it must be made to appear wherein it is alleged to be violated." Chapman v. Adams, Mo., 230 S.W. 80, 81; McGill v. City of St. Joseph, Mo., 31 S.W. 2d 1038, 1040.

Since plaintiff properly raised no constitutional question in the trial court and properly presented no such question in this court, we have neither reason nor excuse to accept the invitation of plaintiff's counsel to browse through the judicial pastures of other jurisdictions from California to New Hampshire for examination of cases involving the Witnesses and their doctrines. Nevertheless, with freedom of religion so basic to our way of life and so cherished by all free people, we would deem it a duty and count it a privilege to deal with plaintiff's purported point in the exercise of our dis-

cretionary power to consider "plain errors affecting substantial rights" under Supreme Court Rule 3.27, *if* plaintiff's constitutional guaranties of freedom of religion had been denied by the judgment under review. However, we can discover no basis for plaintiff's charge that the decree nisi was based upon her religious beliefs and practices. *On the contrary, the record shows that every objection of plaintiff's counsel to inquiries concerning those matters was sustained by the trial judge,* who in some instances pointedly commented that such inquiries were not material or relevant. There was ample evidence to justify and support the award of custody of the two children to defendant, wholly disregarding plaintiff's religious beliefs and practices, and certainly our affirmation of the decree nisi, upon review de novo, is in no wise and to no extent predicated upon or influenced by any religious consideration. The simple truth is that there has been and is no constitutional question in this case. Compare Thomas v. Thomas, Mo.App., 288 S.W.2d 689, 695–696(1–3), certiorari denied 352 U.S. 873, 77 S.Ct. 98, 1 L.Ed.2d 77.

The judgment and decree nisi should be and is affirmed.

McDOWELL and RUARK, JJ., concur.

City Ben. Assessment Special Road Dist. of Platte Co., supra, 52 S.W.2d loc. cit. 859.

7. Wipfler v. Basler, Mo., 250 S.W.2d 982, 985(4); Mannon v. Frick, 365 Mo. 1203, 1212, 295 S.W.2d 158, 166(16); State ex rel. Joslin v. School Dist. No. 7 of Jasper Co., Mo.App., 302 S.W.2d 497, 500(7); Beeler v. Board of Adjustment of City of Joplin, Mo.App., 298 S.W.2d 481, 482–483(1).